IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 20, 2007 Session

IN RE T.C.D.

Appeal from the Juvenile Court for Sullivan County
No. J-31,784      Mark H. Toohey, Judge

No. E2007-00302-COA-R3-JV  - FILED DECEMBER 27, 2007

Brian Wesley Davis ("Father") filed a petition to modify a Final Parenting Plan that, with respect to the parties' child, granted primary residential parent status to Christine A. Williamson (now Stevens) ("Mother").  Father sought exclusive custody of the child or, alternatively, equal co-parenting time with him.   Following a bench trial, the court held in favor of Mother, determining that Father had failed to show a material change in circumstances.  Father appeals.  We have determined that Father has provided sufficient evidence of a material change in circumstances and has demonstrated that the best interest of the child requires a modification of the existing parenting plan.  Accordingly, we reverse the judgment of the trial court and designate Father as the child's primary residential parent. We remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Reversed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY and SHARON G. LEE, JJ., joined.

L. Caesar Stair, III and Margo J. Maxwell, Knoxville, Tennessee, for the appellant, Brian Wesley Davis.

J. Kenneth Wright, Kingsport, Tennessee, for the appellee. Christine A. Stevens.

**OPINION**

I.

In March 2004,[1] Mother, a resident of Kingsport, gave birth to a son, T.C.D.[2] According to Father, a resident of Powell, the child at issue was the product of a sexual encounter in June 2003 following a street party in nearby Knoxville. Mother was married at the time of the encounter, but was in the process of obtaining a divorce. As soon as Father was notified of the pregnancy by Mother, he says that he attempted to talk to Mother regarding her pregnancy. By that time, Mother had moved to Knoxville. Father states that he suggested they visit an attorney in order to discuss their options and to arrive at an agreement about mutually caring for the child. Father contends that Mother rejected his efforts and returned to Kingsport. He testified that Mother apparently believed at that time that he was trying to take the child away from her. She did not allow Father to attend the birth of the child. According to Mother, however, Father informed her that he wanted the paternity results before he came to see the child.

Pursuant to Tenn. Code Ann. §§ 36-2-309 (2005) and 24-7-112 (2000), Father requested that the trial court enter an order requiring paternity testing. The parties eventually entered into an agreed order establishing paternity and setting residential time-sharing provisions. Mother was designated as the primary residential parent. On August 10, 2004, when the child was almost five months old, Father saw his son for the first time.

The order establishing Father's paternity and approving the Final Parenting Plan was entered on August 24, 2004. Major decisions regarding the child were to be made jointly, and Father was ordered to pay child support of $505 monthly directly to Mother beginning September 1, 2004. Father's visitation was outlined as follows:

> The parties understand that due to their son's age and the fact that Mother is presently breast-feeding that an initial familiarization schedule is necessary before Father begins having alternating weekends (on his own) in Knoxville, Tennessee. Until such time, Father's time-sharing will consist of Mother taking the child to Knoxville on Sunday morning and staying until Monday night or if possible until Tuesday morning, one weekend off and two weekends of day time visits on Sunday in Eidson,[3] Tennessee.
>
> If the parties are unable to agree on expanding Father's time-sharing after said initial familiarization schedule and Mother's cessation of

---

[1]In Father's petition, he asserts that the child was born on March 20, 2004. Mother testified that the child was born on March 19, 2004. The Temporary and Final Parenting Plans show a birth date of March 19, 2004.

[2]The child initially carried the last name of Williamson. To protect the child's anonymity, we will utilize the child's initials.

[3]Home of Mother's mother in Hancock County, where Mother was living at the time.

breast-feeding, then either party can request mediation in an attempt to resolve this issue.

(Footnote added).

Father's first visitations with his son were generally spent in the presence of Mother at her then-recently obtained apartment in Kingsport or at the home of Father's grandmother in Andersonville. Mother eventually permitted Father to take the child out by himself for three to six hour periods. According to Father, he was satisfied with the visitation schedule at that point.

Father contends that his visitation problems started on the day after Thanksgiving 2004 when Father first met Bryan Stevens, with whom Mother had become involved in late 2004. Father asserts he was immediately concerned with Stevens' conduct and language:

> [Stevens] did some things that I thought were kind of odd. You know, he told me that he had, . . . dropped out of school and all this stuff. . . . Things that I normally wouldn't have just spat[ ]out to somebody I didn't know. But he told me about how he used to bang lockers, and . . . he was cussing a little bit. And Christine even had to stop him at one point. It was like, "No you don't need to be cussing." And it was in front of [T.C.D.]. So from that point on, from that immediate point I pretty much had a suspicion that something was going on, something was not right. . . .

Father additionally asserted that Mother and her family were uncooperative during custody exchanges:

> But when [Stevens] started coming there was a time where the filming started happening. They would film me picking [T.C.D.] up. And it wasn't like when you pick someone up when she's coming to pick him up down there immediately I'm telling him, "Mommy's coming here. Here she is." When she gets to the door I hand him to her. It's like they walk out and they make it all like you're not supposed to go. There's no handing. There's no saying, "Here's daddy." There's no anything. It's hug, pull, hold him, do whatever to make it as complicated as possible for him to be able to be exchanged. . . .

Father claims the visitation difficulties increased during early 2005:

> And so after the first of the year it even got even worse. It got even more and more . . . harder to make the transition easier. You know, with the filming going on and the other stuff. And then, . . . there was

several times that [Stevens] would be right up on you, following you, saying, . . . it would be like, . . . he would say, "Can you say assault?" He'd tell [T.C.D.] to hold his hand up and wave his hand at me and say "Assault". And all this. And he would come over to the truck and say, . . . "If you . . . you know, kid's talk. You hit him I hit you." And it was just very bad stuff that . . . and I'm like, you know, here's [T.C.D.]. . . .

According to Father, Mother informed him that he could not take the child anywhere alone and if he insisted on doing so, Mother and Stevens had to go along as well. Father noted that the only given reason for the rule change was that Mother did not feel "comfortable."

Father recalled that in January 2005, Mother decided to change the designated "pick-up" site for visitation and informed Father that visitation would occur at her mother's house in Hancock County. Father described the visitation in Hancock County as follows:

When I get there the whole family's there and they're all standing there and we had to walk in. And I was forced to play with [T.C.D.] right there in front of all of them with everybody standing around and everybody doing all their stuff. I couldn't take him anywhere. I couldn't go anywhere. I wasn't called daddy or anything. I was a guest. "We'll [sic] here's your guest. Go play with your guest." . . . So then we try to go outside, but outside is kind of rough and dangerous because I mean they live on a mountain and they've got goats and all this other stuff.

According to Father, his visits with the child were confined to two places:

So we had to learn to play with him in a little area and then it got to the point where, . . . it was either in the gravel driveway or in my truck. That was the only two places that really I was kind of separated where it was just me and him. So for the most part or at least six months the basic theme of my play time with my son was inside my truck. And they all stood there. They would film. They would watch. If I walked down the driveway they would walk down the driveway and stand. If I came up the driveway . . . they would follow me up through there. . . .

Mother and Stevens were married on February 22, 2005. Father contends he became very concerned about the effect Stevens' presence would have on his son:

Now [Stevens] obviously is a very aggressive person. I mean, you can tell that there's some anger in there. Whether he's aggressive to

-4-

men or not I do not know. But I do know from things that I've seen, heard, and everything, and been there, and watched, and things he says to me that, you know, he's not a very kind person. Not a good person, someone you would want around a child all the time or that you would want a child to look up at as a figure to grow up and be like.

Father alleges that his son's conduct changed after Stevens appeared:

[T.C.D.] has actually come up and learn[ed] to hit people, hit them or whatever. And he has told me, "When poppy smacks me I smack him back." And he's learned to use words like fart or booger, or boobies, and stuff. You know, I'm like, "Where did you get this?" And it comes right from that type of . . . that, "From poppy." That's what he says. And I ask him, "Does mommy not stop it?" He said, "No." And I'm like, you know, so I don't know what the relationship is between the two, but I know what [T.C.D.] sees is not a normal, good environment nor is it . . . or is he not ever touched. . . .

On or about March 15, 2005, Father filed a Petition for Custody and/or Petition for Increased Visitation. Father claimed that he feared for the safety of his son due to Mother's relationship with Stevens, who Father believed to have a substantial alcohol and/or drug abuse problem along with a criminal record. Father also claimed that Mother had intentionally disrupted his visitation with the child. Primarily relying on the argument that Stevens' continued presence in the home constituted an unanticipated material change of circumstances and that it was in the child's best interest that a change of custody be granted, Father requested exclusive custody of the child or, in the alternative, that Father be granted equal co-parenting time with the child.[4]

On September 20, 2005, a Temporary Parenting Plan was adopted and approved pending a final hearing in the cause. It established Mother as having primary residential responsibility and granted visitation to Father from 6 p.m. Thursday to 6 p.m. Sunday every other week. The Temporary Parenting Plan stated that "Father or his relatives shall be present during Father's entire visit."

On September 27, 2006, a hearing was held on Father's Petition. Stevens informed the court that he had lived in several cities in Georgia, Virginia, and Florida before he moved to Tennessee. He indicated that in the past two years, he had been employed in four positions. He noted that he met Mother as a co-worker at the same Chop House restaurant in Kingsport at which he had been employed for approximately two years. Stevens testified that he works 40 hours per week and

---

[4]Father also complained about the fact that the maternal grandparents, who lived in a rural area far from adequate health care in case of an emergency, were providing significant amounts of care to the child. By the time of the hearing, however, the maternal grandparents had moved to Kingsport.

Mother puts in approximately 24 hours per week. According to Stevens, the maternal grandmother cares for the child approximately 20 hours per week when both Mother and Stevens are working.

As to the allegations by Father of Stevens' criminal background, Stevens admitted that he had been convicted in 2002 of child abuse and child neglect stemming from possession of child pornography. It appears his charged offense was reduced down to a lesser offense because the State of Florida had evidentiary problems proving that Stevens had downloaded the materials from the Internet. Stevens was sentenced to nine months probation to run concurrent with a 12-month sentence of probation on a conviction for forged instruments/forged documentation and possession of counterfeit notes. Stevens also admitted that he was convicted of domestic violence against his ex-wife and sentenced to twelve months probation.

Stevens' former wife, Marie Christina Stevens, testified that she and Stevens were married from 1999 to 2001. She claimed that Stevens "walked out" on her in June 2001. She described the following alleged incidents of domestic violence by Stevens:

> There was one incident that he got mad at me and pushed me. My friend was in the middle. She was six months pregnant[5] . . . then there was another incident that I had, like I was in the dental office and I was crying cause I was in a lot of pain and when the nurse went back, . . . he grabbed me by the neck and threw me against the wall. When I was six months pregnant with my son he threw a fan into my stomach. He pushed me off of a truck that we were using to move stuff. He got mad at me and pushed me off the back of the truck when I was pregnant with my son. Just different . . . there was a lot of other times that there was domestic, you know, just little arguments would blow up. . . .

(Footnote added). Ms. Stevens indicated that she filed a criminal warrant against Stevens. She further asserted that Stevens abused drugs ("pipe, coke, liquid g") and alcohol, forced her into violent sexual encounters, and indulged in pornography and "fetish clothes" during the marriage.

Stevens responded during his testimony that an order of protection against him was sought by his former wife. He also acknowledged that he was under a Florida court order to pay child support, but that he could not remember the last time he had paid toward this obligation. In response to the claims of his ex-wife relating to drug use, Stevens asserted that he "never had drug issues" and that he "never had a drug problem." He admitted, however, that he had entered himself into drug rehabilitation programs in the past and had "voluntarily" taken some drug tests. He also stated that he had previously lost his driver's license.

---

[5]Genie Clarkson, the friend of Stevens' first wife, testified that Stevens hit her four times in the stomach while she was pregnant during the incident described by Stevens' ex-wife.

Stevens admitted that Mother filed for divorce against him, but claimed the move was "against her will" and that she was "forced" to file for divorce at the insistence of her attorney at that time because of Stevens' criminal background. Stevens testified that he has never abused Mother or the child, and that he and Mother are happily married.

Mother testified that she and Stevens, their three-month-old daughter Kayla, and T.C.D. live in Kingsport. She asserted that she was not afraid of Stevens, even if he did have a felony child abuse conviction. She also indicated that she was not "particularly bothered by the forgery [conviction] at this point." As to Stevens' past domestic violence history, Mother testified that the knowledge of it "doesn't bother" her, stating her belief that, in essence, there are two sides to every story. In an attempt to discredit Ms. Stevens' testimony, Mother claimed that the ex-wife had brought the Stevens' son up to Kingsport and requested that Stevens take custody of him. Mother admitted that on the advice of her prior lawyer, she had filed a complaint for divorce against Stevens.

Mother admitted that she and Stevens reported Father to the Tennessee Department of Children's Services ("DCS") after the child claimed a blow to his head. Father confirmed that he had received a telephone call from DCS sometime in August 2006, at which time DCS investigated the matter. A recording of the interview between DCS and Father was played for the trial court. It appears that the DCS investigator found nothing was wrong with Father's care of the child. Mother further acknowledged that she and Stevens had visited the Knox County District Attorney's office seeking to obtain any criminal records available on Father. While there, Mother purportedly commented that back in June 2003, Father had taken advantage of her while she was intoxicated. She did not, however, file a criminal charge against him.

Mother advised the trial court that she was opposed to her son's visitation with Father:

> The problem is that he [is] gone from Thursday until Sunday at six o'clock every other weekend. [T.C.D.]'s away from me for six . . . excuse me, for three days. He has been with me his entire life. It is very difficult for him to be away from me. He's in an environment that is hostile towards his mother.

Mother asserted that upon her son's return from visitation with Father, the child is "out of sorts" and angry with her, pulling her hair, yelling at her, telling her that Father is going to shoot her, and stating that she is bad. Mother claimed that it took about a week to get the child back on a schedule. She indicated that she had obtained the services of a therapist for T.C.D. The therapist appeared at the hearing and testified that she met with the child after his visits with his father, that she was beginning to develop a therapeutic relationship with T.C.D., and that she was not investigating or assessing the child. According to the therapist, the child had related to her that he was angry with Father. She admitted that she did not try to contact Father and that she did not know whether Father knew that his son was in therapy.

At the conclusion of the hearing, the trial court rendered its opinion. Father's concerns about Mother's marriage to Stevens were acknowledged by the trial judge:

> It's quite clear to me that the only reason, well the main reason this Petition was filed was because of Mr. [Stevens]'s entry into the picture.
>
> I'm not saying the father didn't want custody of the child before that, but certainly Mr. [Stevens] is an individual that quite frankly would raise anybody's concern and concerns . . . the Court as well.
>
> There is nothing good about having a prior conviction for forgery and altering instruments, felony convictions. That indicates, and it can be introduced in this case because it introduced not only the poor character but it introduced [the] propensity to tell a lie. You can't believe those people a lot of times.
>
> This child abuse/neglect thing, that plea apparently stemmed out of him viewing pictures on the internet and as best I could hear from the testimony the State may have had some proof problems, but as to what was actually going on I don't know.
>
> Mr. [Stevens] does not, as much as I can tell, is not paying his child support like he should. He apparently beat up on his ex-wife. And I really question the mother's decision making and wanting to marry a man with this type of a history and bring this man into the home where her child's being raised. I'm very deeply concerned about that decision.

The trial court found that Father had experienced "some difficulty getting visitation." After reviewing a CD of Father's interaction with his son, the court noted that the "child seemed to be fairly happy around his dad."

While the court noted that it was "just so concerned about putting children in situations where there can be harm," the judge opined that Father had "not made out his Petition by the preponderance of the evidence." The judge found:

> I haven't heard any testimony that Mr. [Stevens] has done one bad thing to this child.
>
> I haven't heard any evidence that during the time he's been living in this home with the child that he's been watching any porno movies, on drugs, drinking, fighting. I just haven't heard any of that.

The trial court concluded "it's in the best interest of the child at this point in time to stay in the custody of the mother." In regard to Father's visitation, the trial court ruled: "I don't think it's in the best interest of this child not to have a lot of contact with his dad." The court found the following: "I think [the child's] father cares for him. I think his father takes good care of him when he's visiting with him. And I don't want any interference with this man's visitation by anybody." The trial court cautioned the parents and other adults from making comments, taking movies or doing anything else during the exchanges of the child for visitation that would make the child "feel the least bit uncomfortable."

On December 15, 2006, a judgment was filed, incorporating the Opinion of September 27, 2006. In the judgment, the trial judge ordered that Father's visitation with the child remain as set forth in the Temporary Parenting Order, from 6 p.m. Thursday through 6 p.m. Sunday, every other week, until the child reaches school age; that no one shall interfere with Father's visitation; and that Father shall have two non-consecutive weeks each summer and one week around Christmas. Father filed a timely appeal.

## II.

Father raises the following issues:

> I. Did the trial court err in not finding that a material change of circumstances occurred where Mother married and brought into her home a man who admitted to a felony conviction for child abuse and a history of domestic violence, making it in the best interest of the parties' minor child to change custody from Mother to Father?
>
> II. Did the trial court err in not finding that a material change in circumstances occurred where Mother intentionally interfered with Father's visitation with the parties' minor child and obstructed Father's relationship with the child, making it in the best interest of the child to change custody from Mother to Father?

## III.

The determinations of whether a material change in circumstances has occurred and where the best interests of the child lie are factual questions. *Turner v. Purvis*, No. M2002-00023-COA-R3-CV, 2003 WL 1826223, at *4 (Tenn. Ct. App. M.S., filed April 9, 2003). A trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2006); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).

Because of the discretion given trial courts in the custody area and because of the fact-specific nature of these decisions, appellate courts are reluctant to second-guess a trial court's determination regarding custody and visitation. *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001). Accordingly, courts will decline to disturb the parenting plan fashioned by the trial court unless that decision is based on a material error of law or the evidence preponderates against it. *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). Similarly, a trial court's decision regarding visitation should be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001).

In approaching questions of custody and visitation, the needs of the children are paramount; the desires of the parents are secondary. *Shofner v. Shofner*, 181 S.W.3d 703, 715-16 (Tenn. Ct. App. 2004). Custody or visitation should never be used to punish parents for their human frailties and past mis-steps or conversely as a reward. *Id.* at 716. Decisions on questions related to custody and visitation should be directed towards promoting the child's best interest by placing him in an environment that will best serve his physical and emotional needs. *Id.*

IV.

The threshold issue in every case involving a modification of an existing custody or visitation arrangement is whether a material change in circumstances has occurred. *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002). The standard provides a flexible framework within which the courts consider a number of factors when determining whether an existing custody or visitation arrangement should be modified. *Cranston v. Combs*, 106 S.W.3d 641, 645 (Tenn. 2003).

Tennessee courts are authorized to change custody "as the exigencies of the case may require." Tenn. Code Ann. § 36-6-101(a)(1) (Supp. 2006). Tenn. Code Ann. 36-6-101(a)(2)(C) (Supp. 2006) provides:

> If the issue before the court is a modification of the court's prior decree pertaining to a residential parenting schedule, then the petitioner must prove by a preponderance of the evidence a material change in circumstance affecting the child's best interest. A material change in circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(B) (Supp. 2006) provides:

> If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change in circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or circumstances which make the parenting plan no longer in the best interest of the child.

When both parents are parties, a trial court may modify a custody award when a material change in the child's circumstances has occurred and a change of custody is in the child's best interests. *Kendrick*, 90 S.W.3d at 570; *Blair v. Badenhope*, 77 S.W.3d 137, 148 (Tenn. 2002). The threshold issue is whether a material change in circumstances has occurred after the initial custody determination. *Blair*, 77 S.W.3d at 150. In *Blair*, the Tennessee Supreme Court explained as follows:

> "There are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody." Nevertheless, the following factors have formed a sound basis to determine whether such a change has occurred: the change has occurred after the entry of the order sought to be modified and the change is not one that was known or reasonably anticipated when the order was entered, and the change is one that affects the child's well-being in a meaningful way.

*Id.* (quoting *Solima v. Solima*, 7 S.W.3d 30, 32 (Tenn. Ct. App. 1998) (citations omitted). As a general rule, "changed circumstances" include any material change of circumstances affecting the welfare of the child including new facts or changed conditions which could not be anticipated by the former decree. *Dalton v. Dalton*, 858 S.W.2d 324, 326 (Tenn. Ct. App. 1993).

Not every change in the circumstances of either a child or a parent will qualify as a material change in circumstances. The change must be "significant" before it will be considered material. This court has noted that Tenn. Code Ann. § 36-6-101(a)(2)(C) (Supp. 2006) sets "a very low threshold for establishing a material change of circumstances." *Rose v. Lashlee*, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2 n. 3 (Tenn. Ct. App. M.S., filed August 18, 2006). "By enacting Tenn. Code Ann. § 36-6-101(a)(2)(C), the General Assembly has made a policy decision to make it easier to establish that a material change in circumstances has occurred." *Boyer v. Heimermann*, No. M2006-01566-COA-R3-CV, 2007 WL 969408, at *7 (Tenn. Ct. App. M.S., filed March 30, 2007). The courts must adhere to this policy, even if it establishes a lower threshold than heretofore existed in Tennessee. *Id.*

A marriage of either parent does not, in and of itself, constitute a material change of circumstances warranting a change in custody. It may, however, be a factor where the new spouse changes the home environment of the child. *Tortorich v. Erickson*, 675 S.W.2d 190, 192 (Tenn. Ct. App. 1984). The major factor that the father in *Tortorich* relied on to show a material change of circumstances was the child's changed home environment resulting from the "character of mother's new husband." *Id.*

In *Riddick v. Riddick*, 497 S.W.2d 740 (Tenn. Ct. App. 1973), the Court of Appeals concluded:

> The character, attitude and general personality of other persons who would be in a position to influence the children are important considerations for the court. . . . It is true the mother seeks the custody, but a court cannot overlook the situation in which that custody will place the children.

*Id.* at 742. In *Tortorich*, this court explained that the "important considerations" regarding custody expressed in the *Riddick* case were "valid elements to be considered by the trier of facts when the issue is properly presented by either party. . . ." *Id.* at 192. A panel of this court affirmed the trial court's change of custody based on the considerations:

> After having reviewed all the evidence, this Court would not rest easy on the issue of the best interest of the child, which interest is our total concern, if we were to reverse the action of the Trial Judge and place the custody with the mother (with whom we find no fault in regard to maternal duties) in an unknown and possibly deleterious environment.

*Id.* at 192.

In *McEvoy v. Brewer*, No. M2001-02054-COA-R3-CV, 2003 WL 22794521 (Tenn. Ct. App. M.S., filed November 25, 2003), the trial court changed joint custody of a 7-year-old girl to custody with father as the primary custodial parent because mother had married a man who posed a "credible threat of domestic abuse or violence toward the child" and also because the existing custodial arrangement was not workable. *Id.* at *1. The trial court found that the new husband had a violent disposition and that he had physically abused his wife, his biological son, and a former girlfriend. *Id.* at *4. This court noted that even where the child is not the victim of the abuse, being exposed to domestic violence may have a negative effect on the child. *Id.* The court found that the mother's marriage to an "abuser" provided ample basis for the trial court's finding "that a material change in circumstances had occurred." *Id.* The court also found that one of the factors that supported the trial court's subsequent conclusion that the father was comparatively more fit than the mother to be the primary physical custodian was that "Ms. Spears had married Mr. Spears despite his abusive tendencies and saw nothing harmful in exposing Chelsea to this abusive environment." *Id.* at *5.

In the instant case, the trial court specifically found that Stevens has done nothing bad to the child during his marriage to Mother, nor was there proof that Stevens had engaged in any significant disreputable conduct around the child. The trial court made no specific findings whether there had been a material change in circumstances regarding any interference with Father's visitation.

In our view, the trial court did not apply the proper legal standard for determining whether a material change of circumstances has occurred. Tenn. Code Ann. § 36-6-101(a)(2)(B) (Supp. 2006), as amended in 2002, provides that a material change of circumstance does not require a "showing of substantial risk of harm" to the child. Although the judge did not discuss the legal standard he was applying or expressly refer to the pre-2002 standard that a material change of circumstances requires a showing of a "substantial risk of harm to the child," his ruling that there was no material change of circumstances appears to be based on his finding that Stevens "had not done one bad thing to the child."

Although it may have been reasonably anticipated that Mother would eventually marry, it would not be reasonably anticipated that a responsible mother of her first child would marry a man with felony criminal convictions, including a recent felony child abuse conviction, and a history of domestic violence and bring such a person into her home to be part of her child's life. The changed circumstances in this instance have affected the child's well being in a "meaningful way," *Blair*, 77 S.W.3d at 150, as there was evidence presented that the child had already been taught inappropriate conduct and language by his new stepfather clearly related to Stevens' criminal history. As argued by Father, teaching a young child to hold up his fist and say "assault" is consistent with the conduct and influence of a man convicted of domestic violence. We agree with Father that the evidence reveals that the child has demonstrated violence and vulgarity since Stevens became a part of the child's home life.

Such concerns for the child's safety and well-being are heightened by Mother's apparent cavalier attitude towards the character and conduct of Stevens. Mother's actions are similar to the mother in *McEvoy v. Brewer,* a case in which the Court of Appeals found a change of custody appropriate, in part, because the mother had married an abusive husband and "saw nothing harmful in exposing [her child] to this abusive environment." 2003 WL 22794521, at *5. At the hearing in this case, Mother repeatedly testified that her husband's convictions just did not "bother" her. Mother also did not seem "bothered" by the allegations that her husband had abused both his ex-wife and another woman. Instead, Mother repeatedly testified how much she loved her husband and how happy she was in her new marriage. We cannot help but question whether Mother's testimony reveals a woman who may well subordinate her responsibilities to protect her young children to her own desires.

The evidence of record reveals that Stevens was an abusive husband in his previous marriage. Stevens' conduct as a father to his own child in Florida is also instructive, as he admitted that he could not remember the last time he paid child support. There was no proof introduced at trial that he visited or had a close relationship with his own child in Florida. Stevens' conduct as a father persuades us that he is not well qualified to act as a stepparent. Under the amended standard of

Tenn. Code Ann. § 36-6-101(a)(2)(B), the character, history, and conduct of Stevens, coupled with the indifferent attitude of Mother, sufficiently satisfies the current standard for finding a material change of circumstances.

In this case, the evidence preponderates against the trial court's finding that Mother's marrying and bringing Stevens into her child's home did not constitute a material change of circumstances that would require a best interest analysis of the existing custodial arrangement and changing custody to Father.

Once it has been determined that a material change in circumstances has occurred, then the issue becomes whether a modification of custody is in the child's best interest, considering the factors set forth in Tenn. Code Ann. § 36-6-106(a) (2007 Pub. Act, c. 245, §§ 1, 2, eff. May 24, 2007). Tennessee's courts are statutorily authorized to alter custody arrangements as required by intervening circumstances. Tenn. Code Ann. § 36-6-101(a)(1). If a material change in circumstances has occurred, the best interest analysis becomes mandatory. *Keisling v. Keisling*, 196 S.W.3d 703, 718 (Tenn. Ct. App. 2005).

However, a finding of a material change in circumstances since the entry of the visitation order does not predetermine the outcome of the best interests analysis. *Krupp v. Cunningham-Grogan*, No. M2005-01098-COA-R3-CV, 2006 WL 2505037, at * 7 (Tenn. Ct. App. M.S., filed August 29, 2006). Thus, a finding of a material change in circumstances warranting a re-evaluation of the parenting plan does not necessarily require that any change in visitation be made. *Id.* Such a finding requires that the court move to the second step -- the best interest analysis.

The relevant statutory "best interest" factors are as follows:

> (1) The love, affection and emotional ties existing between the parents or caregivers and child;
>
> \* \* \*
>
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; . . .
> (4) The stability of the family unit of the parents or caregivers;
> (5) The mental and physical health of the parents or caregivers;
> (6) The home . . . record of the child;
>
> \* \* \*
>
> (8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; . . .
> (9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and such person's interactions with the child; and
> (10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and

encourage a close and continuing parent-child relationship between the child and both of the child's other parents, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a) (2007 Pub. Acts, c. 245, §§ 1, 2, eff. May 24, 2007).

As noted, in making custody determinations, one of the relevant factors to be considered is the custodial parent's ability to facilitate the child's relationship with the other parent. Tenn. Code Ann. § 36-6-106(10). The evidence presented in this case overwhelmingly reveals that Mother intentionally interfered with Father's visitation with his son, failed to adhere to the terms of the Parenting Plan, and was and is unwilling to encourage or facilitate a "close and continuing" relationship between Father and his son. The Final Parenting Plan of August 24, 2004, and the Temporary Parenting Plan of September 20, 2005, did not order the Father's visitation be supervised. Yet, without the benefit of any motion for modification, hearing, or order, Mother unilaterally decided to limit and restrict Father's visitation by requiring that Father visit with the child at her parent's home in Hancock County and by not allowing Father to take his son out of her presence. Father was permitted to visit with his young son only at the house of Mother's family or in the driveway. Every other Sunday, Father and his son were basically forced to sit in Father's truck or to play in the gravel driveway for the entire visitation period, with their every movement filmed by Mother or Mother's family members. Father was referred to as the child's "guest" and his son was told to play with his "guest." The only alternative was for Father and the child to sit in the home of Mother's family and "play" in front of Mother and Mother's family members. As noted by Father, in establishing these new "rules" for visitation, Mother did everything to make Father's visitation with his son as onerous, uncomfortable and harassing as possible for both Father and the child. Even when "actual" visitation exchanges of T.C.D. took place, these events were accompanied by inappropriate conduct and filming by Mother and her family and by the disruptive presence of Stevens.

The record in this matter further supports the conclusion that Mother and Stevens acted maliciously to obstruct Father's relationship with his son by consulting with the Knox County District Attorney's Office in an attempt to "collect criminal records" about Father and by bringing apparently fabricated child abuse charges against Father by making a referral to DCS.

Mother has clearly attempted to obstruct the relationship between Father and his son. At trial, Mother claimed that there was no bond between Father and the child and expressed her desire to reduce Father's visitation. No place in the record before us does Mother show any willingness to encourage or facilitate a close and continuing relationship between Father and his child.

The evidence shows that Mother has interfered with visitation and did not adhere to the terms of the Final Parenting Plan. Specifically, Mother's restriction of visitation and requirement of "supervised" visitation was in direct violation of the Final Parenting Plan. This evidence alone – that an existing arrangement has proven unworkable for the parties – may be sufficient to satisfy the amended material change in circumstances test. **Boyer**, 2007 WL 969408, at *6; **Rose**, 2006 WL

2390980, at \*2. It would be difficult to argue that this evidence, when added to the evidence regarding Stevens, does not amount to a material change in circumstances and does not warrant a change in the identity of the child's primary residential parent.

V.

Father is hereby designated as the child's primary residential parent. Mother is hereby granted the parenting time previously granted to Father by the trial court. Mother will transfer custody of the child to Father no later than 6 p.m. on January 3, 2008. Mother's first period of alternating weekend parenting time will commence at 6 p.m., on Thursday, January 10, 2008. On remand, the trial court is directed to set Mother's child support obligation pursuant to the provisions of the Child Support Guidelines.

VI.

The trial court taxed the costs of the cause equally to the parties. This part of the judgment is also reversed and costs at the trial court level are taxed to Mother. The trial court's award of fees to Mother and against Father is also reversed. Father's request for fees and expenses at trial and on appeal is hereby granted. On remand, the trial court is directed to hold a hearing for the purpose of determining Father's reasonable fees and expenses at trial and on appeal.

VII.

The trial court's judgment is reversed. Costs on appeal are taxed to Mother, Christine A. Stevens. This case is remanded for further proceedings and for collection of costs at the trial court level, all pursuant to applicable law.

_____
CHARLES D. SUSANO, JR., JUDGE