IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 1, 2016

**JAMES RYAN SKELTON v. JENNA MARIE SKELTON**

**Appeal from the Chancery Court for Lewis County**
**No. 2010CV115     Joseph Woodruff, Chancellor**
_____

**No. M2015-01426-COA-R3-CV – Filed May 16, 2017**
_____

A father and mother moved to modify a permanent parenting plan in which they were each named primary residential parent. Both parents alleged, for different reasons, that a material change in circumstance had occurred sufficient to modify custody. After a hearing, the court determined a material change in circumstance had occurred and that modification of the current joint custody arrangement was in the child's best interest. The court named the father the primary residential parent and granted the mother liberal visitation. The mother appeals, arguing that the court erred in finding that her move was a material change and in dismissing her modification petition. Upon review, we conclude that the evidence does not preponderate against the chancery court's findings, and the court did not err in dismissing Mother's petition. Accordingly, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and BRANDON O. GIBSON, JJ., joined.

Ronald G. Freemon, Columbia, Tennessee, for the appellant, Jenna Marie Skelton.

Melanie Totty Cagle, Centerville, Tennessee, for the appellee, James Ryan Skelton.

# OPINION

## I.

On September 30, 2013, Ryan Skelton ("Father") filed a petition in the Chancery Court for Lewis County, Tennessee, to modify an agreed permanent parenting plan order concerning his son, Davin.[1] The agreed permanent parenting plan order named both Father and Davin's mother, Jenna Skelton ("Mother"), as primary residential parents and awarded each parent 182.5 days of parenting time each year. The plan also contained the following provision related to the child's schooling:

> The parties agree that the minor child shall attend Lewis County School System on Jan. 3rd, 2013 and if he fails to do so then the Mother shall be in contempt of court. Each party agrees that before the minor child can be removed from the Lewis County School System or if the parent relocates outside of Lewis County, they SHALL have court approval.

In his modification petition, Father alleged several material changes had occurred, namely Davin's mother had relocated outside of Lewis County in violation of the parenting plan, adopted a "partying" lifestyle, neglected Davin's educational needs, and engaged in inappropriate relationships. Father asked the court to award him sole custody and sole authority to make decisions regarding Davin's education.

Mother initially denied any material change had occurred. Then, on May 8, 2015, Mother filed a cross-petition also seeking a custody modification. Mother alleged a material change had occurred in that Father had changed jobs, and his new job required him to be away from home Monday through Friday; thus, he was only able to parent Davin on the weekends.

### A. Proof at Trial

The court held a hearing on the cross-petitions to modify custody on June 23, 2015. We summarize the testimony only to the extent relevant to Mother's move, Davin's educational needs and familial relationships, and Father's employment.[2]

At the time of the hearing, Father had been married to Lauren Skelton for four years. The couple lived in Hohenwald, Tennessee with their two-year-old daughter and

---

[1] Father's petition also alleged his former spouse was in civil contempt. The chancery court found she was not in contempt, and Father has not appealed that finding.

[2] At the hearing, Father acknowledged that his concerns over Mother's lifestyle and relationships had abated.

her son from a previous relationship. According to their testimony, Davin had a close relationship with his Father, his stepmother, and his step-siblings. Davin and his stepbrother were the same age and attended the same school, albeit in different grades.

Mother was also remarried at the time of the hearing, and she lived in Lawrenceburg, Tennessee. She testified that Davin had a good relationship with both his fifteen-year-old half-brother, who is Mother's son from a different relationship, and Mother's new spouse, Morgan Foster.

Father worked as a truck driver. Although he had previously been employed locally, in March 2015, he began making weekly trips to Florida as a long distance truck driver. He testified that he made the change based on the increased pay. Because he was self-employed, Father had the ability to arrange his own schedule, and he limited his travel to three nights per week. Lauren Skelton testified that she took care of the children, including Davin, while Father was traveling.

Father and Lauren Skelton explained that the current joint parenting arrangement was implemented after Davin was diagnosed with attention-deficit hyperactivity disorder or ADHD. Mother and Father agreed that Davin would enroll in public school in Lewis County on January 1, 2013, halfway through his second-grade year, and spend equal time with each parent. As part of the plan, Mother moved to Hohenwald in early 2013, but she relocated to Lawrenceburg within six months.

Although Mother's home in Lawrenceburg was 27 miles from school, Davin continued to attend public school in Lewis County as specified in the parenting plan. He spent alternating weeks with each parent; custody was exchanged on Fridays at school. Testimony at trial indicated that the commute between Mother's home and Davin's school ranged from thirty to forty-five minutes each way, depending on the traffic conditions.

According to Father and Lauren Skelton, Mother's move had a detrimental impact on Davin's school attendance. In third grade, Davin was often late to school and was even sent to detention for excessive tardiness. Although Mother admitted that sometimes she overslept, she claimed that Davin was no more than ten minutes late and blamed most of his tardiness on inclement weather. Contrary to Lauren Skelton's testimony that the required detention upset Davin, Mother maintained that detention was no different from after school care. All parties agreed that Davin's school attendance improved in fourth grade after Father filed his petition to modify custody.

Father and his wife also testified that Mother's move made the weekly custody exchanges more difficult. Father and his wife complained that Mother would bring Davin to school on Fridays without an adequate supply of his ADHD medicine and require them to drive to Lawrenceburg to retrieve it. Father testified that Mother told him

3

she had withheld the medicine to punish Father. For her part, Mother claimed that Father failed to provide the medicine first, and she simply responded in kind. Again, Lauren Skelton testified that the medicine exchange had gone more smoothly since Father filed his petition.

Father also testified that, although Davin had expressed interest in participating in extracurricular sports at school, Mother had refused based on the additional driving time the daily practice schedule would require. Mother agreed that Davin would benefit from the structure of extracurricular sports, such as baseball, but maintained Davin was already involved in motocross racing in Lawrenceburg, a sport that he loved.

Mother's move also impacted her ability to attend scheduled events at Davin's school. Mother missed all of Davin's parent-teacher conferences and only attended one open house while Father and Lauren Skelton were always in attendance. Mother claimed that she missed the conferences and open houses because she did not receive sufficient notice to rearrange her work schedule. But she admitted that a detailed school schedule was available through the school's website at the beginning of each year.

Lauren Skelton testified that, in her opinion, Davin was at least two years behind his grade level. Davin had an individualized education plan ("IEP") at the Lewis County school, which was created to remedy his academic deficiencies and behavior issues. At the time of the hearing, the IEP included additional individualized help for Davin outside of the classroom. On a yearly basis, school representatives reviewed and revised Davin's IEP with input from his parents. Father and Lauren Skelton attended all but one IEP meeting, which they missed because of sickness. Again, Mother failed to attend because of her work schedule.

In addition to extra instruction at school, Mother and Father agreed that Davin needed extra help at home. Father and his wife worked with Davin for at least an hour each night on various skills. At the time of the hearing, Lauren Skelton had located an outside tutor willing to assist in preparing Davin for the upcoming school year.

Mother insisted that Davin received adequate academic help at her house; her spouse helped Davin with his homework each day after school. While Mother agreed Davin might benefit from extra tutoring, she claimed the joint custody arrangement interfered with her ability to schedule any tutoring when Davin was at her house.

Mother attributed Davin's lack of academic progress to the limitations of the Lewis County school system. In her opinion, Davin would receive more effective assistance in Lawrence County public schools.

Several employees at Davin's school also testified. The school secretary brought Davin's attendance records, which revealed multiple tardies during third grade. Most of

4

the records did not indicate which parent had custody when Davin was tardy. The school secretary confirmed that Davin had no tardies in fourth grade.

The court also heard from Davin's second grade teacher. She testified that Davin performed well during the first month he was in her second grade classroom, but his performance quickly deteriorated. She agreed that, during the first month, Davin had lived full time with Father while Mother was moving. According to her testimony, Davin needed academic stability and would benefit from on-time arrival at school and an adult that required him to complete his homework each day.

A special education teacher from Davin's school also testified that, although she personally invited Mother to Davin's IEP meeting during third grade, Mother did not attend and never contacted her. She agreed that all children need to arrive at school on time and ready to learn. Even being slightly late can be disruptive to a classroom. She corroborated earlier testimony that Davin needed stability to succeed academically, including a consistent study routine.

Father and Mother agreed that the joint parenting arrangement was not working. Father blamed Mother's move and lack of attention to Davin's educational needs while Mother focused on Father's change of employment. Both parents opined that it would be in Davin's best interest to award them sole custody.

## B. THE CHANCERY COURT ORDER

On June 30, 2015, the court issued findings of fact and conclusions of law. The court found that Mother's move to Lawrenceburg materially affected the workability of the joint parenting arrangement and that Father's new travel schedule was also a material change. Based on this finding of a material change, the court considered whether a modification of custody would be in Davin's best interest. After considering the applicable statutory best interest factors, the court named Father the primary residential parent and awarded Mother liberal visitation during the school year. The court further ordered that Mother would have increased visitation during all school vacations. The court adopted a new permanent parenting plan consistent with its findings.

## II.

### A. STANDARD OF REVIEW

As we have often noted, "[c]ustody and visitation determinations often hinge on subtle factors." *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996). Consequently, we "are reluctant to second-guess a trial court's decisions" on such matters. *Id.* We review the trial court's factual findings de novo on the record, with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App.

P. 13(d); *Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013). We review the trial court's conclusions of law de novo with no presumption of correctness. Tenn. R. App. P. 13(d). We give great deference to the trial court's findings with regard to credibility of witnesses, *In re Alexandra J. D.*, No. E2009-00459-COA-R3-JV, 2010 WL 5093862, at *3 (Tenn. Ct. App. Dec. 10, 2010), and we will not overturn such findings absent clear and convincing evidence to the contrary. *See Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014).

## B. MODIFICATION OF PARENTING AGREEMENT

The threshold issue in considering a petition to modify an existing parenting arrangement is whether a material change in circumstance has occurred. *Caldwell v. Hill*, 250 S.W.3d 865, 869 (Tenn. Ct. App. 2007). Whether a material change has occurred is a question of fact. *Armbrister*, 414 S.W.3d at 692. The parent seeking a modification has the burden of proving a material change by a preponderance of the evidence. Tenn. Code Ann. § 36-6-101(a)(2). (Supp. 2016)

This case presents the unusual situation in which both parents alleged that a material change had occurred, the court agreed, and yet one parent has appealed the court's finding of a material change. Mother contends that the court erred in finding that her move to Lawrenceburg constituted a material change. She does not challenge the court's finding that Father's employment as a long-distance truck driver was a material change.

In the context of a modification of custody, also known as a change in the primary residential parent, a material change in circumstance may "include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child." *Id.* § 36-6-101(a)(2)(B). Although there are "no hard and fast rules" for determining when a material change in circumstance has occurred, factors for our consideration include: (1) whether the change occurred after entry of the order sought to be modified; (2) whether the change was known or reasonably anticipated when the order was entered; and (3) whether the change affects the child's well-being in a meaningful way. *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002), *abrogated by statute on other grounds as recognized by Armbrister*, 414 S.W.3d at 685. Not every change in circumstance is a material change; "[t]he change must be significant before it will be considered material." *In re T.C.D.*, 261 S.W.3d 734, 744 (Tenn. Ct. App. 2007).

Mother contends that the chancery court erroneously based its finding of a material change solely on the fact that her move violated the provision in the agreed permanent parenting plan related to the child's schooling. Mother misapprehends the court's finding. Based on testimony at the hearing and the schooling provision, the court determined that the proximity of both parents to Davin's school was an important feature

of the joint parenting arrangement.  Thus, Mother's move was a material change in circumstance "that [made] the parenting plan no longer in the best interest of the child." *See* Tenn. Code Ann. § 36-6-101(a)(2)(B).

Mother concedes that a change of residence, regardless of the distance, can constitute a material change if the move "affects the well-being of the child in a meaningful way." *Kendrick*, 90 S.W.3d at 570.  But she maintains that Father failed to prove by a preponderance of the evidence that her move had such an effect.  We disagree.

The evidence does not preponderate against the finding that Mother's move adversely affected Davin's academic progress.  Both parents agreed to the joint parenting arrangement after Davin's diagnosis in an effort to address his educational needs.  Despite the extra help he has received at school and at home, Davin continues to lag behind his peers and has shown only limited improvement.  His teachers testified that the key to his academic success is a stable routine including regular, on-time attendance at school, adult supervision over his homework, and a consistent study routine.  Proof at the hearing established that Mother's move had both limited her involvement at his school and affected Davin's ability to be in class on time and ready to learn.  Mother agreed that the joint parenting arrangement had not benefited Davin as expected.

While Mother was free to move, the chancery court retained jurisdiction to modify its previous custody decision "as the exigencies of the case may require." Tenn. Code Ann. § 36-6-101(a)(1).  Once the court found a material change, re-examination of the existing custody arrangement in light of the child's best interest became mandatory.  *In re T.C.D.*, 261 S.W.3d at 746.  The court's finding of a material change did not predetermine the outcome of the best interest analysis.  *Id.*  Consequently, Mother's argument that the court erred in failing to conduct a best interest analysis based on her alleged material change is misplaced.  The court's finding of a material change, whether it was based on Mother's move or Father's job, required a new determination of which parent was "comparatively more fit than the other to be the custodial parent." *McEvoy v. Brewer*, No. M2001-02054-COA-R3-CV, 2003 WL 22794521, at *5 (Tenn. Ct. App. Nov. 25, 2003).  After consideration of the statutory factors, the court determined that naming Father the primary residential parent was in Davin's best interest, and Mother has not challenged that finding on appeal.  *See* Tenn. Code Ann. §§ 36-6-404(b), -405(a) (2014).  Under these circumstances, we find no error in the court's dismissal of Mother's modification petition.

### III.

The evidence does not preponderate against the chancery court's finding that a material change in circumstance had occurred sufficient to consider whether a modification of custody was in Davin's best interest.  We also conclude that the chancery court did not err in dismissing Mother's modification petition after it determined that

7

naming Father as the primary residential parent was in Davin's best interest. Accordingly, we affirm.

_____
W. NEAL McBRAYER, JUDGE