IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 26, 2013 Session

# ELIZABETH ANN WOODARD MAXWELL
v.
# RONALD EDWARD WOODARD, JR.

Appeal from the Overton County General Sessions Court
No. DIV813    Tiffany Gentry Gipson, Judge

No. M2011-02482-COA-R3-CV - Filed May 31, 2013

This appeal involves post-divorce modification of a parenting plan. The father filed a petition alleging a material change in circumstances and seeking to be designated primary residential parent for the parties' minor son. After an evidentiary hearing, the trial court found a material change in circumstances but declined to designate the father as primary residential parent. Instead, the trial court left the mother in place as primary residential parent and increased the father's parenting time. The father now appeals the trial court's decision not to designate him as the primary residential parent. We reverse, holding that the evidence in the record preponderates against the trial court's holding that it is in the child's best interest for the mother to remain the primary residential parent, so the trial court erred in denying the father's petition to designate him as the primary residential parent.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court is Reversed and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Phillips M. Smalling, Byrdstown, Tennessee for Respondent/Appellee, Elizabeth Ann Woodard Maxwell

Kelly R. Williams, Livingston, Tennessee for Petitioner/Appellant, Ronald Edward Woodard, Jr.

## OPINION

### FACTS AND PROCEEDINGS BELOW

Petitioner/Appellant Ronald Edward Woodard, Jr. ("Father") and Respondent/Appellee Elizabeth Ann Maxwell Faulkner[1] ("Mother") were married and had one child, a son named Maxwell, born in 2001. They divorced in June 2005. At the time of the divorce, Maxwell was approximately four years old. Mother was designated as the primary residential parent and Father was awarded residential parenting time every other weekend, three weeks in the summer, and generally split holidays with Mother. This parenting arrangement remained in place for approximately six years, and the parties were able to resolve problems that arose without resorting to litigation.[2]

That situation changed in approximately January 2011, when Maxwell was 10 years old. Maxwell began telling Father that Mother often left him at home by himself, when she went to the grocery store, to visit her ailing parents, or to the nearby country club. Father received telephone calls from Maxwell in the evenings when Mother was away; frequently Maxwell was tearful. Concerned, Father looked through the text messages on Maxwell's cell phone to corroborate what Maxwell had been telling him. Father saw several text messages from Maxwell to Mother at night; the messages were asking Mother where she was and when she would be home, and telling her that he was hungry. Mother's responses were text messages to Maxwell saying things such as give me a minute, be there in a minute, I'll grab you a burger on my way home, etc.

Even more concerning, Maxwell began asking Father how to use a gun. When Father asked Maxwell why he was suddenly expressing an interest in guns, the child explained that Mother had told him that there was a gun in Mother's house that the child could use for protection when he was in the house by himself.

These developments prompted Father to file a petition in June 2011 in the General Sessions Court for Overton County, Tennessee, seeking a temporary restraining order against Mother and also seeking to be designated as primary residential parent for Maxwell. This was during

---

[1] After Father filed the petition that is the subject of this appeal, Mother remarried and changed her last name to Faulkner.

[2] There were a few incidents during this time. One involved a camping trip in which Father and his then girlfriend, now wife, slept in a tent together; another involved Mother's allegedly aggressive behavior toward Father's mother, which prompted the paternal grandmother to call 9-1-1. These incidents were apparently resolved without litigation.

Father's designated summer parenting time. The trial court entered an *ex parte* temporary restraining order and set a hearing for a few days later.

Less than a week later, the trial court held an evidentiary hearing on Father's petition. At the hearing, the trial court heard testimony from Mother, Father, and Maxwell.[3] About a month later, the trial court entered an order. The trial court observed that Maxwell "is a very smart, very honest young man." Based on Maxwell's testimony, the trial court found that Maxwell

> . . . has been left alone, at home, by his mother, at night, while the mother goes to a nearby bar and drinks, sometimes to the extent that she can't stand up and has to have help walking into the house. . . .

Based on this finding, the trial court designated Father as the temporary primary residential parent and gave Mother residential parenting time every other weekend. Both parties were prohibited from discussing the case with Maxwell or disciplining him for speaking his mind about his preference. In addition, the order enjoined both parties from drinking in the child's presence, leaving him alone "at any time," and from having "any weapons in their home." The trial court set the matter for hearing in August 2011 and appointed a guardian ad litem for Maxwell.

Three days before the August 2011 hearing, Mother filed her response to Father's petition. Mother admitted that she had consumed alcohol, "but not to excess and not in the direct presence of the child." She asserted that "any desire expressed by the child to live with his father is due to coercion from the father and statements and allegations about the mother which are not true." She also claimed that Father allowed Maxwell "to engage in improper activities for his age" and "do as he pleases." Mother denied any material change in circumstances, asserted it was in Maxwell's best interest for her to remain as primary residential parent, and asked for an increase in Father's child support obligation.[4]

### *Material Change in Circumstances*

As scheduled, the trial court held the evidentiary hearing on Father's petition in August 2011.[5] The trial court bifurcated the proceedings, to consider first the threshold issue of

---

[3]The record does not contain a transcript of the June 2011 evidentiary hearing.

[4]Child support is not an issue on appeal.

[5]In accordance with the order temporarily naming Father as the primary residential parent, about three weeks before the hearing, Maxwell began attending a new school in Father's school district. Mother and Father
(continued...)

whether there was a material change in circumstances, and then, if necessary, hear evidence on whether changing the designation of primary residential parent was in Maxwell's best interest. The trial court heard several witnesses, including both parties, guardian ad litem Andrea Ayers ("GAL"), and the child. The trial court began by hearing Maxwell's testimony in chambers, with counsel and the guardian ad litem present, but not the parents.[6]

At the outset, the trial judge reminded Maxwell that she had spoken to him at the prior hearing and recalled that he told her at that time that some things about living with Mother weren't "going so well." The trial judge indicated to Maxwell that they would have to revisit some of those matters. In response to the trial judge's questions about when things started not going well with Mother, Maxwell said that, about the time he turned 10 years old, Mother "started going down to the [country] club" down the road from their home "a lot and I was by myself at home a lot." Maxwell said he was also left alone at home when Mother went to the grocery store or to the home of her elderly parents. He said that, two or three times a week, Mother left him alone at home after dark for "a couple hours" to go to the country club. This happened both during the week and on weekends, at least sometimes without Mother giving the child supper. Maxwell gave the trial judge a somewhat surprising response to her next question:

> Q.  Okay. Did she [Mother] give you any instructions when she left, like, Do this, do that, call me if you need me –
> A.  Well –
> Q.  – anything like that?
> A.  – one time, she said that there was a gun under the mattress and she said to use–
> Q.  Excuse me, repeat that. A gun under the mattress?
> A.  Un-huh, yes, ma'am? And she said to use it if anything happened, and I didn't want to, so I just went in my room and watched TV.

---

[5](...continued)
live in different cities.

[6]Mother's counsel argued that the parties should be allowed to be present during the child's testimony, "even though it may be difficult on the child." Father's counsel argued that Mother had previously threatened and whipped the child when he requested to live with Father, so having the parents present would be detrimental to the child. The GAL contended that she had spoken to the child about whether the parents should be present; she said that the child "does not feel comfortable" with having the parents present and argued that the child "should not be put in that position." The trial court excluded the parents from her chambers while the child testified.

Maxwell clarified that the gun was kept under Mother's mattress. The trial judge commented to Maxwell that it must have been "scary." Maxwell acknowledged that, when Mother left him alone, he was afraid and lonely. When Mother returned from the country club at night, Maxwell said, he thought maybe she had been drinking. In response to questions about that perception, the child described that, although Mother could stand up, she would "fall over kind of, . . . just kind of stumble, and she would talk weird . . . just mumble."

Maxwell confirmed that he told Father that Mother had been leaving him at home by himself. When he was asked why he did that, Maxwell became upset and the trial court took a break before resuming his testimony.

After the break, Maxwell was asked again about the gun Mother had showed him. He said that Mother showed him the gun under her mattress, said that she got the gun at her parents' home, told him that it was not a toy, and said that she would use it if anyone broke into the house. Asked if seeing the gun made him curious about it, Maxwell would say only that it was "weird." Maxwell said that later, on a telephone call with Father, he blurted out to Father, "She showed me a gun that was under the mattress, so." Father took in that information but did not immediately ask Maxwell any questions about the gun. Maxwell said he would sometimes call Father on the telephone when Mother left him at home by himself.

Maxwell was asked about how things had been going for him since Father was temporarily designated as the primary residential parent. Maxwell explained that, at Father's home, he had stepbrothers around his age with whom he liked to play, and added, "It's so fun." When Maxwell was asked what he and Father do together, he said, "We pretty much do everything together," and indicated that he stayed by Father's side "all the time." Under the new arrangement, he said, his weekends with Mother were also "good" and that Mother had not left him to go to the country club while he was there. He said that he got along well with Mother's new husband Rodney Faulkner.

The first weekend at Mother's house after the temporary designation of Father as primary residential parent, Maxwell said, Mother talked to him about the litigation and Maxwell's statements to the court about what he "wanted to do." The child said, "Well, just once she was trying to make me change my mind. . . . [a]bout going and living with my dad." Maxwell said that Father does not ask him about with whom he wants to live, but several times in the past Maxwell had confided to Father that he preferred to live with Father. He said that Father told him that one day he would be old enough to tell the court where he wanted to live.

The GAL asked Maxwell to explain his preference to live with Father:

Q. . . .You know, we had talked before about why you, you know, wanted to go with your dad so strongly and why, what the difference was between living with your mom and living with your dad.

A. He takes care of me better and we get to see the whole family a lot more.

Q. What do you mean he takes care of you better?

A. Like, she would just leave me at home and she went to the grocery store and my dad, we go everywhere.

Maxwell conceded that it was "scary" to start a new school in Father's school district and that he missed his old school and his friends there. However, Maxwell said that he had made new friends at his new school. When asked where he would go if he could go anywhere to school, Maxwell stated that he would prefer to go to his new school "and see how it goes" because he liked to make new friends. Maxwell said that he wanted to continue the arrangement that was in place, with Father as the primary residential parent and residential time at Mother's home every other weekend. He indicated that he did not want to go to Mother's home every weekend.

The trial court heard Father's testimony only on the issue of material change in circumstances. His testimony was generally consistent with Maxwell's on the things Maxwell had told him about Mother leaving the child at home alone, and Maxwell's frequent telephone calls to Father when the child was at home by himself. After Father checked the text messages on Maxwell's cell phone between Maxwell and Mother, in which Maxwell repeatedly texted Mother questions on when she would be coming home and the like, Father said, "I knew right then, I was like, he's getting left alone a lot." Father's testimony was also consistent with that of Maxwell on the child rather suddenly blurting out to Father that Mother had showed him the gun kept under her mattress and told him to use it for protection in her absence. When Maxwell told him about the gun, Father said, "that really blew me away."

The GAL testified that Maxwell's private statements to her about Mother repeatedly leaving him at home alone to go to the nearby country club and other places were consistent with the child's testimony to the trial court. The GAL said that Maxwell's description to her of Mother coming home from the country club intoxicated was also consistent with his testimony in chambers. The GAL said that Mother denied doing anything more than leaving Maxwell at home alone briefly "a couple of times" to go to the grocery store or to her parents' home. As to the country club, Mother told the GAL "that would only be if she was cooking dinner or in the afternoon just simply walking there and getting a drink and coming right back." The GAL believed that it was inappropriate for a child Maxwell's age to be left

-6-

alone for periods of time, regardless of the reason. All of this, the GAL acknowledged, "would cause me concern."

In her testimony in the first part of the hearing on material change in circumstances, Mother claimed that she started leaving Maxwell at home for 20 minutes at a time, only during daylight hours, when she went to see her parents, because the child became uncomfortable being around her parents as their health deteriorated. She did not recall the text messages from Maxwell that Father described, other than one in which she told him she would bring him a burger. Mother was asked about "the longest period of time that you would stay away, leave [Maxwell] there alone if you went to the [country club] clubhouse." Mother testified that "it would be five, five, six, seven minutes, long enough to go down, get a drink, and then come home." Mother conceded that she met her new husband at the country club. She said they dated about six months and got married shortly after Father filed his petition for modification of the parenting plan.

Mother protested Father taking Maxwell from her based on "lies." Asked if she meant that Maxwell was lying about being left at home alone, Mother first said, "yes, he is exaggerating." Pressed further, she asserted, "My son is not, not telling the truth in this case," and that the child was telling untruths in order "to please his father." Likewise, when she was asked if she showed Maxwell the gun under her mattress, Mother said, "Absolutely not" and that Maxwell's testimony to that effect "is an untruth." She also denied her son's description of her drinking "to the point that I stumble and fall around and slur my words" and claimed that Maxwell "is letting his father brainwash him." Mother said: "If [Maxwell] is so, if he is so unhappy with the fact that I drink in front of him occasionally, I'll stop. I will never go down to that clubhouse again. I will, I'll stop . . . ."

At the conclusion of the testimony on material change in circumstances, the trial court evaluated the witnesses' testimony and made findings on that threshold issue:

> In speaking with the child, which is the bulk of the proof, obviously, in this case, in speaking with this young man, I do find him to be intelligent, I find him to be very articulate. He loves both his parents, so emotionally he feels torn, I believe. But I do find him to be a credible witness and will make that finding today, that that young man is a credible witness. His mother had testified that he was mature but not mature. I don't exactly know what that means, but I assume it to be in some things he's mature and in some things he still needs care and guidance from his parents.
>
> And among that would be to make sure that he is cared for and provided for and continually in a safe environment, and I do not believe that the child is

mature enough to be home alone at ten years old. I just cannot make that finding today that he is mature enough to be home alone. And because of that, I do think that those actions could potentially place that child at risk of harm, of substantial harm. That's even without making a finding of the purpose for that child being left home alone, whether it was to go check on your parents who were ill, whether it be to go to the grocery store, or whether it was to go to [the] bar there at the golf course. Without making a finding as to where you were going, I think in and of itself that the child was left home alone was completely inappropriate. . . .

[T]he fact that this child testified that he believed that you were at the bar and that you came home . . . in an intoxicated state is very concerning to the Court. And to be quite honest with you, he was able to describe the actions of an intoxicated person, honestly, better than some law enforcement officers that I've heard testimony from.

And because he was able to describe your behavior in that detail and has been consistent with those descriptions, obviously, causes the Court some concern. I don't think the proof has to be that you were gone for long period of times late at night. I don't think that that's the standard that I have, that I'm required to go by. I do believe that there has been sufficient proof based on the statements of this child and the testimony the Court has heard from that perhaps these are limited circumstances . . . but those limited circumstances are none the less significant and significant to the point that I believe the Court must move to a best interest determination.

Thus, the trial court specifically credited Maxwell's testimony and found that Mother had engaged in the conduct he described in his testimony. Emphasizing its reliance particularly on Maxwell's believable testimony, the trial court found a material change in circumstances. It went on, then, to hear proof on the second element, whether it was in Maxwell's best interest to designate Father as the child's primary residential parent.

### *Best Interest*

In the second part of the bifurcated hearing, the trial court heard further testimony from Father, Mother, and the GAL on whether it would be in Maxwell's best interest to make permanent the trial court's temporary designation of Father as the child's primary residential parent. It also heard testimony from other witnesses, including the paternal grandmother and Mother's new husband.

Father testified first. He began by explaining what caused him to file the modification petition in this case. For years, Father said, Maxwell had told Father that he was not happy and he wanted to live with Father, and Father responded by telling the child, "let's make the best out of it and then maybe one day things will be different" and "[i]f you still want to, one day, I'm sure you'll have the opportunity to, to address that." On cross-examination, Mother's attorney re-characterized Father's testimony: "[Y]ou advised him that when he got older he could make the decision? . . . You have been instilling that in him that he's the decision maker in this?" Father responded, "No. . . . [O]kay, if every time you picked up your son, he begged to stay with you and not have to go back, you know, I heard that for years and years and years. You know, I didn't know what to say."

In addition to what the child was telling him, Father noticed that "physically, [Maxwell] was not growing [and had] weighed the same virtually for years it seemed like." In sports, it seemed that Maxwell "was scared to be out there, or scared to mess up," "had no self-confidence" and was "just kind of beat down." Even Maxwell's personal hygiene seemed to be lacking, as though he were not washing. Father perceived that, overall, Maxwell was not getting the care he needed and "he just wasn't happy."

Then Maxwell began frequently calling Father "late at night, you know, crying and wanting to be with me." When Maxwell called Father, in the evenings between 6:00 p.m. and 9:00 p.m., "he'd always be at the house by himself . . . I'd ask what him what he's doing, he's like, I'm eating cookies, I'm watching TV. And that was like every night for . . . a week. And I was like, [h]ave you had supper, and . . . he just didn't say a lot." The repeated instances of Maxwell being left alone at home, as corroborated by the text messages on Maxwell's cell phone, and Father's concerns about the gun in Mother's home, finally prompted Father to file the modification petition.

For the first few weeks after the trial court temporarily designated Father as the primary residential parent, Father said, Maxwell was "just attached to" him and stayed with Father every possible moment. That eased up as Maxwell became more comfortable and confident. By the time of trial, Father said, Maxwell had become a "completely, completely different kid," was "more open and loving" and was "definitely thriving." Father testified that Maxwell had become "really outgoing" and was "getting some self-confidence back." Maxwell adapted well to his new school and his new teachers confirmed that, as of the time of trial, he was doing great. When it came to sports, Father often practiced with Maxwell but did not believe in forcing the child to participate if he did not want to. Physically, within the two months Maxwell had lived with Father, the child's hygiene improved and he "[went] up two sizes in shoes and gain[ed] ten pounds."

Father described their day-to-day schedule since Maxwell began attending his new school. Generally, Father was picking Maxwell up from school and bringing the child back to work with him until approximately 5:00 every day. Father's mother and sister worked in the business with Father. Maxwell had been well-behaved and had not presented any discipline problems. Father said Maxwell is never left alone at his house, gets along well with his stepbrothers, and they do everything as a family. Father characterized his relationship with Maxwell as "really good." He emphasized that "part of having a kid is giving them the attention that they need" and "showing him love."

In his testimony, Father was asked about several allegations against him.[7] Mother's attorney asked Father if he permitted Maxwell to watch R-rated movies at his home. Father conceded that Maxwell had in fact watched R-rated movies without Father's knowledge, and after Father learned of it, he placed a code on the television to control the child's access to inappropriate content. Father admitted that he stayed in a tent with his current wife Dena prior to their marriage while on a camping trip with Maxwell, but he denied telling Maxwell to refer to Dena as "Joe" so that Mother would not know that he had taken a female companion on the trip.

Father was asked about another biological child, much younger than Maxwell, with another ex-wife. Father conceded that he had no relationship with the child because the child's mother lived far away in Kentucky and had made it clear that she did not want Father involved "in any of it." At the time of the hearing, Father testified that he had come to realize that having no relationship with that child "wasn't the best choice." Father said he'd been "working toward" becoming more involved with that child and hoped to see the child the day after the hearing.

Mother also took the stand again. Despite the trial court's specific finding that Maxwell's testimony was credible on Mother repeatedly leaving him at home alone for significant periods of time and coming home intoxicated, Mother stuck to her guns and maintained that she had done no such thing. Mother claimed that, since January 2011, she left him alone to go the grocery store "maybe twice," and since April 2011 "maybe twice" to visit her parents, each time no more than 15 to 20 minutes, and not after dark. Each time, she added, she called him to check in with him and to tell him she'd be back in 10 or 15 minutes. Mother

---

[7]Mother asserted that, during the parties' marriage, Father was verbally and physically abusive to her. Father denied any verbal or physical abuse and said that Mother was verbally abusive and physically aggressive towards him during their marriage. The paternal grandmother described incidents of verbal abuse and physical aggression by Mother towards her and towards the child. Mother denied any verbal or physical aggression or abuse, although she admitted she is taller than Father and had slapped him on occasion, to defend herself. The trial court made no factual findings on any of these allegations.

was asked, "Have you ever left Maxwell alone at night?" She initially said "no," and then conceded that she left him at home alone to go to the country club for a drink, but "[n]ot for longer than five, six, seven, eight minutes."[8] She continued to maintain that Maxwell was "embellishing."

Asked if she had done anything to address the allegations that her son had made, such as seeking counseling or an alcohol assessment, Mother said that she had not. Repeating the assurance she gave in the first part of the hearing, Mother said, "No, I haven't [gotten an alcohol assessment], but I will. I will do anything to keep my child. . . . I, I will quit drinking. I have, I have, I have barely drank over the past two months." She claimed, "I think about Maxwell every day, all the time." When asked whether she was thinking about Maxwell when she left him at home to go to the country club, Mother replied, "No, I was thinking about getting a drink."

In the second part of the hearing, Mother's testimony about the gun evolved from her testimony in the first part of the hearing. As set forth above, as her initial response to Maxwell's testimony - that she showed the child the gun under her mattress and advised him to use it for protection in her absence - Mother said "Absolutely not" and that his testimony was an "untruth." In the second part of the hearing, she explained that she found the gun at her father's home and thought it was dangerous to have a gun there, so she instead brought the gun to her home with Maxwell. She said that she put the bullets in a place Maxwell did not know, and put the gun under her mattress until her brother could come get it. She conceded that she in fact told Maxwell that the gun was under the mattress:

> We talked about it, we looked at it . . . . I explained to him that it wasn't a toy. I explained to him that he would be, that he could be curious about it and it was fine for him to be curious about it. It was fine for him to want to look at it. But, but I told him that if he wanted to look at it, that he needed to come and get me first and we could look at it together. If he was curious about it, that's fine. But it was something that I felt like he needed to know[.]

Mother was asked why she believed Maxwell would say the things that she claimed were untrue or embellishments. Mother stated that she believed Maxwell was being "coerced" by Father. She described Father as a "Good Time Charlie" who gave Maxwell new toys and allowed him to do whatever he wanted at Father's house. As an example, Mother cited an incident in which Father permitted Maxwell to leave his baseball game, and asserted that Father was "teaching him to be a quitter." She also said that Father allowed Maxwell to watch R-rated movies and took him to concerts that were "age inappropriate."

---

[8]Asked if she left the child alone at home at night, Mother responded, "Well, define night."

-11-

As an example of Father's alleged coercion of Maxwell, Mother cited an incident in which she received a phone call from Maxwell. In the phone call, the child raised his voice to Mother and told her that he did not want to return to her house. Mother claims she could hear Father "in the background talking to him" during Maxwell's call. Toward the end, she said, she could hear Father "prompting him . . . what to say," but Mother did not testify on what Father was prompting Maxwell to say. Three hours later when she came to pick up Maxwell, Mother said, the child was excited to see her. Mother asserted that Father's actions are motivated by a desire to "continue to abuse" her.

Since the trial court temporarily designated Father as the primary residential parent, Mother said, Maxwell's behavior had become "atrocious" and "awful." She said that the child kept passing gas in her face even after she told him not to, and that he kicked her, told her to shut up, and told her to be quiet when she directed him to do something. She said that Maxwell threw a pillow and ball at her face as hard as he could. Mother asserted that she had never before seen behavior like that from Maxwell. In disciplining Maxwell, Mother said that she felt like she had to "tiptoe around it," but had told him that his behavior was not appropriate. Mother said this caused her to have concern for his morals and his treatment of other people. Mother also had concerns about what Father may be teaching the child about the opposite sex. Mother also expressed concern about the fact that Father had a child in Kentucky with whom he had no relationship.

Mother asserted that it is in Maxwell's best interest for her to be his primary residential parent. She noted that the child had been doing well in school. If the trial court designated her as the primary residential parent, Mother said, Maxwell would be in a new school because he would be in middle school instead of elementary, but he would be with many of the students with whom he had grown up. Mother teaches high school physical education, and she said that after school, Maxwell would ride the school bus to her school and stay there until she had completed any after-school duties at the high school.

Mother also offered testimony from her new husband, Maxwell's stepfather, Rodney Faulkner. Faulkner said that he and Maxwell have a good relationship. He corroborated Mother's testimony about Maxwell's recent disrespectful behavior toward Mother and said that the child was not minding Mother as well since he began living with Father.

Asked about the accusations that Mother left Maxwell at home alone to go to the bar at the country club, Faulkner confirmed that he met Mother at the clubhouse bar. He said that, when they were dating, they "occasionally" met down at the bar. He confirmed that he and Mother had also gone together to drink at the country club bar; he said that on those occasions, Maxwell was left alone at home "just for a short period of time," approximately 15 to 20 minutes. As he described it, they would get one drink, drink most of it at the country

club bar, and then walk back up to the house with the remainder of the drink. Faulkner had no concern that Mother may be an alcoholic.[9]

The trial court also heard more testimony from the GAL during the second part of the hearing.[10] She testified at some length about her interactions with Maxwell and her recommendations. The GAL explained that she met with Maxwell on multiple occasions, with meetings for as much as several hours at a time, at the homes of both Mother and Father, and alone with Maxwell in her office. During the visits, the GAL observed a significant difference in Maxwell's demeanor at each parent's home. At Mother's home, the GAL said, she found that Maxwell was "more qui[et] and more reserved." She said Maxwell seemed "okay at his mom's house," but when she talked to him there, he appeared "a little reserved and uncomfortable." The second meeting took place at the GAL's office; Maxwell was overall "more relaxed." The GAL reassured him that Mother had left and the child quickly got over his initial nervousness with being in her office and was "at ease" with her questions. The GAL then described her third meeting with Maxwell at Father's home:

> Well, I first, when I got there in the afternoon, I waited until everyone had gotten home. And [Maxwell] was already home and upstairs with his stepbrothers. And [Father] was home and Dena, the wife, came shortly thereafter, and we sat and talked for a while in the kitchen. And then [Maxwell] came, I'm not sure if he realized whether I was there or not, but they were upstairs, and he came kind of bounding through the stairway. At the top of the steps, he saw me and we spoke and he was very comfortable.
>
> And [Maxwell] came down and all three of the boys kind of hung out for a little bit and we talked about school, and he wanted to show me his room and where they played drums, and his stepbrother had taught him how to play the drums and he wanted to show [m]e his pets and – it was just very comfortable, very at ease there.

At Father's home, the GAL testified, the child was "very comfortable, very at ease, very relaxed, happy, smiling and . . . well adjusted to the home." The GAL allowed for other factors that may have been at work, such as the fact that her meeting with Maxwell at

---

[9]The trial court also heard testimony from the principal at the high school where Mother taught physical education, who was also Mother's childhood friend, as well as Mother's brother. Both testified that she is a good parent to Maxwell.

[10]To avoid repetition, our description of some of the GAL's testimony in the part of the hearing on material change in circumstances has been combined with the description of her testimony during the part of the hearing on best interest.

Father's home was the third time they had spoken, while the meeting at Mother's home was the first, and nevertheless found the contrast to be noteworthy.[11]

The GAL was asked if Maxwell's loneliness was being addressed at Father's home; she responded "certainly it is," noting that Maxwell's stepbrothers are often there. She added that all of Maxwell's needs were being met at Father's home. While meeting with Maxwell at Father's house, the GAL asked Maxwell if he missed Mother while he was there. Maxwell responded that he did, but then added that he got to talk to her on the phone; the GAL said that this confirmed to her that Father was letting Maxwell communicate with his mother while there and that Father's home "was where he wanted to be."

The GAL said that the only concern she had about Maxwell living with Father was the fact that he had to go to a new school. Initially, she said, Maxwell was excited about his new school and loved it, but during his testimony earlier that day in chambers he became upset when he was asked if he missed his old friends; this caused the GAL some concern. Overall, however, the GAL testified that she had no concerns about Maxwell adjusting well or his physical well being in Father's home.

The GAL then offered her recommendation to the trial court. After considering all of her interactions with Maxwell and both parties, the GAL testified that Father's home was the best home for Maxwell. She then explained how she came to that conclusion. Despite Mother's assertions to the contrary, the GAL saw no indication that anyone had coached Maxwell into stating that he wanted to live with Father, and said Maxwell "seems to be sincere when he says that to me." She found Maxwell to be credible and said that he had been "consistent on every occasion that I have spoken to him as far as . . . the general issues that are at hand." The GAL factored Maxwell's preference into her recommendation, as well as his "emotional wellbeing," and went so far as to say that she believed that the child would be "emotionally . . . crushed" if Father were not permanently designated as primary residential parent. The GAL also appreciated the fact that, at Father's house, Maxwell had stepbrothers close in age often there, as well as cousins who were nearby.

The GAL went on, however, to testify that even if Maxwell's preference had been to live with Mother, the GAL nevertheless "would still recommend that [Maxwell] go to his father's because for me it's a balancing test. . . . I'm still giving credibility to [Maxwell's] statements and allegations that his mother came home frequently drunk and left him alone." The GAL explained:

_____

[11]At Mother's home, the child had just woken up when the GAL arrived.

The reason my recommendation would be the same [had Maxwell expressed a preference to live with Mother] is because of the concerns of the, assuming the allegations were true, which this Court has found by a material change in circumstance they were, that she left him home frequently alone, that she came home, you know, intoxicated, those concerns for me would still outweigh his preference. They're on the opposite side of the scale. But the way it is right now, they're not.

The GAL observed that the parents do not communicate with each other, and emphasized that Maxwell should maintain a relationship with both parents. If Father were designated as primary residential parent, she believed that arrangement would be in Maxwell's best interest and "he will kind of get the best of both worlds."

At the conclusion of the proof, the trial court took the matter under advisement. Subsequently, by teleconference, the trial court issued an oral ruling, going through the factors set forth in Tennessee Code Annotated § 36-6-106.

At the outset of its oral ruling, the trial court noted that both parents have strong affection and emotional ties to the child, are in good physical and mental health, and can provide the child with necessities. The trial court observed that Mother had been the primary caretaker for over six years, during which time the child developed well emotionally and physically, made good grades, and participated in extracurricular activities, without incident until recently. The trial court also acknowledged that the child did equally well in the short time he had been living with Father. It noted that both parties had remarried and both stepparents seemed to have a good relationship with Maxwell.

The trial court commented that it was not required to consider Maxwell's preference, because he was less than 12 years old, but it had nevertheless decided "upon request" to consider it as a factor. The trial judge recounted that Maxwell had told her in chambers that he desires to live with Father, and noted that he had told the GAL the same thing. While the child's preference can be a factor, the trial court also cautioned that "a custody determination cannot be made solely upon the testimony and desires of a minor child."

The trial court observed that there was essentially no communication between the parents, to the detriment of Maxwell, and found that neither parent encouraged a healthy relationship with the other parent. It noted evidence that Father in the past had asked the child to refer to his then-girlfriend by a man's name in order to avoid court action about her overnight visit on a camping trip, as well as testimony that Father was whispering to Maxwell in the background while the child was speaking inappropriately to Mother on the telephone.

-15-

Consistent with the trial court's finding after the first part of the hearing on material change in circumstances, the trial court held that the proof was sufficient to hold that Mother left the child alone "on various occasions" and for a variety of reasons. The trial court said that the "most concerning" was leaving Maxwell at home alone "for the purpose of going to the Country Club . . .to socialize, which. . .include[d] social drinking as well." The trial court found specifically that "the child was able to sufficiently describe his mother and give characteristics that were sufficient to support that the child had seen [Mother] while under the influence of alcohol." It stated: "[W]hether or not the child exaggerated the extent of the consumption or the frequency, which of course, [Mother] refutes, regardless of that, the Court does find that there were times that the child was home alone, . . . watching TV and playing, the Court does make that finding."

In addition, the trial court expressed concern about the testimony "that there was a weapon in the home," and that Mother knew that the child was curious about it. The trial court found "there was potentially inappropriate behavior in whether that gun would be found." All told, the trial court found "sufficient proof [of] behavior on the part of [Mother] that was sufficient to place the child at a risk of harm . . . .[and] that those actions were detrimental to the well being of the child." It held, however, that her behavior was not enough to "justify such a drastic measure as a change in custody and a change in school systems."

As to Father's home, the trial court recalled hearing proof concerning "certain liberties" at Father's house that were not allowed at Mother's house, such as watching R-rated movies. The conduct permitted by Father, the trial court said, "[w]hile not extreme, [is] obviously age inappropriate." The trial court was also troubled by testimony from Mother and her husband that Maxwell "displayed a disrespectful attitude toward his mother since he's been in the care of his father" and noted some of the examples given in their testimony. The fact that Father had another child born during his second marriage for whom he had paid no child support and with whom he had no relationship was also "disturbing," despite Father's stated intention to forge a relationship with the child. The trial court said all of this evidence was taken into account to evaluate each parent's past and future parenting.

> The trial court described its assessment of the credibility of the witnesses:
> In weighing the credibility of all the witnesses, I do find those witnesses to be credible, all of the witnesses credible, in their testimony as a whole, while obviously understanding that certain facts that were testified to were presented in a light more favorable to their position, by either being downplayed in some circumstances, . . . if they thought necessary.
>
> As to statements of the child in particular, I did previously find him to be credible and do find . . . consistency of statements. And there was no evidence

-16-

presented on this particular occasion or this particular set of circumstances, there was no evidence of any coaching. Although, the Court would obviously find that as any child at ten years of age, he would be impressionable. And the proof was submitted . . . of previous incidents of coaching the minor child by the father. And so, I did take that into consideration.

After reviewing the evidence on the statutory factors, the trial court gave the legal standard it applied and its conclusions. On the legal standard, the trial court stated:

I cannot, solely upon the testimony of the minor child, find that the mother is unfit to have custody. And as such, in not being able at this time to find that she is, although the actions are certainly inappropriate, I cannot find at this time that she is unfit to have custody.

In light of this standard, the trial court stated, "there is a strong presumption . . . in favor of continuity of placement." The trial court then said that "the father has the burden of pro[v]ing that conjunctively [sic] he is more fit." Pursuant to this standard, the trial court held that Mother should remain the primary residential parent, with modification of the parenting arrangement. Among the modifications was an increase in Father's residential parenting time during the summer and the child's school breaks.

The trial court then entered a written order that incorporated by reference the transcript of the trial court's oral ruling. The written order found a substantial and material change in circumstances. It said: "[T]hough the child has expressed a preference to live with the father[,]. . . based upon the law said proof of preference cannot be the sole basis for a modification of the existing custody Order and it is but one factor that the Court has considered." The written order referenced the legal standard "set forth in the full transcript" and held based on that standard that the proof did not support a change in the designation of primary residential parent. In addition to increasing Father's parenting time, the trial court modified the parenting plan to add the following restrictions:

1.  There will be absolutely no alcohol consumed by any parent in the presence of the minor child and neither parent shall consume alcohol immediately preceding any parenting time.

2.  The minor child shall not be left alone for any purpose until the age of thirteen (13) and only then if the child has matured and developed sufficiently so as to not place the child at risk of harm.

3. There shall be no weapons . . . within the proximity of the minor child or at the house of the minor child which are not locked or concealed.

The order also prohibited derogatory comments about the other parent in Maxwell's presence. From this order, Father now appeals.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Father argues that the trial court erred in declining to designate him as the child's primary residential parent. He contends that the evidence preponderates against the trial court's ruling and that the trial court's holding is against logic and reasoning. He asserts that the trial court failed to consider the best interest of the child. Specifically, he argues that the trial court failed to consider the guardian ad litem's testimony or the preference of the child, and did not address the mother's drinking problem or order her to submit to an alcohol assessment.

Our review of the trial court's findings of fact is *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); ***Kendrick v. Shoemake***, 90 S.W.3d 566, 570 (Tenn. 2002); ***Marlow v. Parkinson***, 236 S.W.3d 744, 748 (Tenn. Ct. App. 2007). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. ***Walker v. Sidney Gilreath & Assocs.***, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); ***Realty Shop v. RR Westminster Holding***, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). In weighing the preponderance of the evidence, findings of fact that are based on witness credibility are given great weight, and they will not be overturned absent clear and convincing evidence to the contrary. ***In re Adoption of A.M.H.***, 215 S.W.3d 793, 809 (Tenn. 2007).

As to the trial court's legal conclusions, our standard of review is *de novo* on the record, according no deference to the trial court's decision. ***Bowden v. Ward***, 27 S.W.3d 913, 916 (Tenn. 2000).

## ANALYSIS

Decisions involving the custody of a child are among the most important decisions courts face. ***Steen v. Steen***, 61 S.W.3d 324, 327 (Tenn. Ct. App. 2001). In considering questions involving parenting arrangements for children, the needs of the children are paramount and the desires of the parents are secondary. ***See In re T.C.D.,*** 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007) (citing ***Shofner v. Shofner***, 181 S.W.3d 703, 715-16 (Tenn. Ct. App. 2004)). Decisions on parenting arrangements "should be directed towards promoting the child's best

interest by placing him in an environment that will best serve his physical and emotional needs." *In re T.C.D.,* 261 S.W.3d at 742-43.

At the outset, we must clarify our interpretation of the trial court's determinations on the credibility of the witnesses, as we are, of course, required to give great deference to those determinations. *Wright Med. Tech., Inc. v. Grisoni*, 135 S.W.3d 561, 582 (Tenn. Ct. App. 2001). In its oral ruling, the trial court made this general statement about the witnesses' credibility: "I do find . . . all of the witnesses credible, in their testimony as a whole" but tempered that generalization somewhat by acknowledging that some witnesses testified about "certain facts . . . in a light more favorable to their position." Of course, in this case, it cannot be that *all* of the witnesses were truthful. In her testimony, Mother went to great lengths to assert that her son's version of certain key events, such as Mother's trips to the country club bar, whether she came home intoxicated, and her statements to the child about the gun, were simply not true. In the GAL's testimony, the GAL explicitly pointed out how Mother's statements to her on these matters differed substantially from what Maxwell told the GAL.

The trial judge, on repeated occasions, specifically credited Maxwell's testimony, accompanied by clear, cogent explanations of why she found his testimony overall, and on the key disputed subjects in particular, to be believable. She relied on the child's testimony when she temporarily designated Father as the primary residential parent, she did so again when she made the factual finding that there was a material change in circumstances, and she did so once again in her final ruling. The trial court stated that Maxwell "is a very smart, very honest young man," that he was "a credible witness," that there was "consistency" in his statements to the trial court and to the GAL, and it found "no evidence of any coaching" of Maxwell, despite Mother's assertions to the contrary. Therefore, in approaching the task at hand, on factual matters on which Maxwell's testimony differed from others such as Mother or Father, we will assume that the trial court intended to credit Maxwell's version of events.

"Trial courts are vested with wide discretion in matters of child custody." *Varley v. Varley*, 934 S.W.2d 659, 665 (Tenn. Ct. App. 1996) (quoting *Koch v. Koch*, 874 S.W.2d 571, 575 (Tenn. Ct. App. 1993)). Accordingly, the appellate court will decline to disturb the parenting plan fashioned by the trial court unless that decision is based on a material error of law or the evidence preponderates against it. *See In re T.C.D.,* 261 S.W.3d at 742 (citing *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997)). Similarly, a trial court's decision on a parenting plan should be set aside only when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *In re T.C.D.,* 261 S.W.3d at 742 (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001)).

Where a parent files a petition to modify a parenting plan, the analysis is a two-step process. First, the parent who seeks to modify the existing parenting arrangement has the burden of proving the requisite material change in circumstances. *See* Tenn. Code Ann. § 36–6–101(a)(2)(B)(2010); *Taylor v. McKinnie*, No. W2007-01468-COA-R3-JV, 2008 WL 2971767, at *3 (Tenn. Ct. App. Aug. 5, 2008) (citing *Kendrick*, 90 S.W.3d at 570). If a material change in circumstances has occurred, the trial court then must ascertain whether a change in the designation of primary residential parent is in the child's best interest, considering the factors in Tennessee Code Annotated § 36-6-106(a). *See Wall v. Wall,* No. W2010-01069-COA-R3-CV, 2011 WL 2732269, at *24; 2011 Tenn. App. LEXIS 385, at *73 (Tenn. Ct. App. July 14, 2011) (citing *Boyer v. Heimermann*, 238 S.W.3d 249, 259 (Tenn . Ct. App. 2007)). The determination of whether a material change in circumstances has occurred, and whether such a change necessitates a modification of the parenting arrangement, are both questions of fact for the trier of fact. *Wall,* 2011 WL 2732269, at *21; 2011 Tenn. App. LEXIS 385, at *78 (citing *In re T.C.D.*, 261 S.W.3d at 742).

As in *Wall,* the trial court below found a material change in circumstances, but found that the change warranted only an increase in the father's parenting time, not a change in the designation of primary residential parent. *Wall,* 2011 WL 2732269, at *26; 2011 Tenn. App. LEXIS 385, at * 78. Also similar to *Wall,* Father in this case insists that the trial court erred in only increasing his parenting time, rather than designating him as the primary residential parent.

No issue on appeal is raised as to the trial court's factual finding on the threshold issue of whether a material change in circumstances had occurred. The issues raised on appeal in this case involve only the trial court's factual finding on Maxwell's best interest. "Therefore, we consider whether the evidence preponderates in favor of the trial court's factual finding that permanently designating Father as the primary residential parent was not in [Maxwell's] best interest." *Wall,* 2011 WL 2732269, at *26; 2011 Tenn. App. LEXIS 385, at * 78 (citing *In re T.C.D.*, 261 S.W.3d at 746).

We consider first the legal standard applied by the trial court below. In stating the legal standard it applied to the evidence, the trial court twice said that it "cannot . . . find that the mother is unfit to have custody." Thus, the trial court in effect held that, in order to prevail, Father was required to prove that Mother "is unfit to have custody" of the child. This is incorrect. As set forth above, once the trial court finds that the parent who seeks modification has proven a material change in circumstances, it is then tasked with making a factual determination on whether a change in the designation of primary residential parent is in the child's best interest. *See Wall,* 2011 WL 2732269, at *24; 2011 Tenn. App. LEXIS 385, at *73 (citing *Boyer*, 238 S.W.3d at 259). "A finding that a material change in circumstances has occurred is a threshold inquiry that, when made, allows the court to

-20-

proceed to make a fresh determination of the best interest of the child." ***Richards v. Richards,*** No. E2010-00521-COA-R3-CV, 2011 WL 2135432, at *6 (Tenn. Ct. App. May 31, 2011) (citing ***Kendrick***, 90 S.W.3d at 569). Therefore, we must hold that the trial court applied an incorrect legal standard to the question of whether to change the designation of primary residential parent.

Next we consider Father's argument that the evidence in the record preponderates against the trial court's factual finding that it was not in Maxwell's best interest to designate Father as primary residential parent. The natural starting point for our analysis is the conduct by Mother that formed the basis for the trial court's finding of a material change in circumstances. Maxwell testified that, on numerous occasions, Mother left the 10-year old alone in the evening to go socialize at the local country club, showed the child a gun under her mattress and told him to use it for his protection if needed, and returned hours later, intoxicated. As noted above, although Mother disputed some of his testimony, we interpret the trial court's ruling to credit the child's testimony on these issues.

The ways in which such a scenario could go badly wrong are incalculable. Father testified that, when Maxwell blurted out to him on the telephone that Mother had left him at home to go drink at the country club and showed the child a gun to use in her absence, it "blew [him] away." We agree. The evidence indicated that this was not an isolated incident, but rather was a pattern of poor judgment. Such "evidence shows clearly that Mother consistently exercised poor judgment and prioritized her own needs and desires above those of her child." ***See Wall,*** 2011 WL 2732269, at *28; 2011 Tenn. App. LEXIS 385, at *86-87.

At trial, Mother asserted: "If [Maxwell] is so, if he is so unhappy with the fact that I drink in front of him occasionally, I'll stop. I will never go down to that clubhouse again. I will, I'll stop . . . ." Mother did not explain why she had not already stopped this behavior, since by the time of trial it had already resulted in the trial court's temporary designation of Father as the primary residential parent.

Mother's approach at trial is noteworthy as well. From our review of the record, a primary thrust of Mother's testimony was to – repeatedly – malign her young son as, well, a liar. Notably absent from Mother's testimony was any indication that she had made an earnest effort to determine if there was a legitimate basis for Maxwell's wish to live with his father, or to even consider such a possibility; instead, she dismissed his stated desire as the child permitting himself to be "brainwashed" by Father. Maxwell testified that Mother pressured him to change his mind on his desire to live with Father; Mother did not deny this in her testimony. Moreover, despite the fact that it is traumatic for a young child to testify in a custody proceeding, "knowing one parent or the other would be disappointed," Mother took the position that the trial court should permit her to be present during Maxwell's testimony.

*See Costley v. Benjamin*, No. M2004-00375-COA-R3-CV, 2005 WL 1950114, at \*19 n.19; 2005 Tenn. App. LEXIS 484, at \*56 n.19 (Tenn. Ct. App. Aug. 12, 2005) (noting that it is traumatic for a young child to testify in custody disputes). The GAL told the trial court that the parents' presence during testimony would make the child deeply uncomfortable, and the trial court wisely chose to exclude the parents from her chambers during Maxwell's testimony.

All of this indicates an unwillingness on Mother's part to create an environment that is both physically and emotionally safe for her child, one that meets both his "physical and emotional needs." *See In re T.C.D.,* 261 S.W.3d at 743.

While the trial court clearly credited Maxwell's testimony in making its factual findings on events that occurred and Mother's conduct, it appeared to minimize the weight given to his stated desire to live with Father. In its oral ruling and its written order, the trial court repeatedly cautioned that "a custody determination cannot be made solely upon the testimony of the desires of a minor child" and "though the child has expressed a preference to live with the father[,]. . . based upon the law said proof of preference cannot be the sole basis for a modification of the existing custody Order."

We agree with the trial court that due caution is in order in considering the testimony of a child on his preference in a custody matter. This Court has recognized the problems that can arise, such as children deciding "they would rather live with the more lenient or generous parent rather than the one who just refused to buy the newest must-have item or who set rules the child did not agree with." *Costley*, 2005 WL 1950114, at \*16; 2005 Tenn. App. LEXIS 484, at \*48. More ominous, a parent may, intentionally or unintentionally, force a child to choose sides or pressure a child into expressing a preference. *Costley*, 2005 WL 1950114, at \*19; 2005 Tenn. App. LEXIS 484, at \*55.

Appropriate caution should not, however, prevent a trial court from giving due weight to a child's testimony where his preference is not motivated by such factors. In the case at bar, Mother asserted variously that Maxwell's testimony that he wanted to live with his father was a result of Father's "coercion," coaching, or "brainwashing," or because Father was a "Good Time Charlie" to the child. As found by the trial court, the evidence offered at trial did not bear out these allegations. The GAL said that her observations of Maxwell in their hours together caused her to conclude that Maxwell's stated preference was "sincere," consistent over time, and not the result of any coaching by Father. Father gave undisputed testimony that the child had been saying for years that he wanted to live with Father.[12] The trial court

---

[12]Mother did not dispute this but instead questioned the propriety of Father's response to the child's

(continued...)

recounted testimony offered by Mother on Father purportedly coaching the child, such as Father talking in the background while Maxwell was speaking inappropriately to Mother on the telephone, but found overall that Maxwell's testimony to the court had been consistent and was not coached or coerced.

The reasons Maxwell gave for his preference are significant as well. In response to the GAL's questions, Maxwell said that he wanted to live with Father because "[h]e takes care of me better" and because Mother "would just leave me at home and she went to the grocery store and my dad, we go everywhere." The child described feeling lonely and unsafe when Mother left him alone, and Father described the child repeatedly calling him from Mother's house, in tears. All of the child's reasons for his stated preference are consistent with the factual assertions by Maxwell in his testimony that were credited by the trial court. Where the trial court is reasonably satisfied that the child has not been manipulated and the child's reasons for his preference are not frivolous, it is permissible, indeed important, to give significant weight to the child's testimony on the parent with whom he wants to live.

The GAL, who was among the witnesses deemed credible by the trial court, gave compelling testimony on her recommendation that Maxwell be permitted to live with Father. She described a measured, deliberate approach to her duties, talking with Maxwell at Mother's house, Father's house, and her office, over many hours, and she expressly accounted for factors such as whether a given conversation with the child was her first or her third. Taking all such factors into account, she vividly described the difference in Maxwell's demeanor at each parent's home. She testified that he was quiet and reserved but "okay" at Mother's house, but was positively exuberant at Father's house, "bounding" down the stairs with his stepbrothers and showing the GAL his bedroom and his drums. She said that her recommendation would be the same had Maxwell indicated that he preferred to stay at Mother's house, because of the numerous instances in which Mother had left the child alone to go drinking and socializing. The GAL poignantly predicted that Maxwell would be "emotionally crushed" if the trial court declined to permanently designate Father as the primary residential parent.

Father's testimony was consistent with the GAL's observations and Maxwell's testimony. Father testified that he finally decided to file the modification petition because Maxwell continued to appear depressed, "beat down," lonely, and unsure of himself; Father said the child persistently "just wasn't happy." Immediately after Father was temporarily designated as Maxwell's primary residential parent, Father said that the child stayed with him every

---

[12](...continued)
entreaties; Father testified that he told Maxwell to make the best of it for now, but someday the child would have the opportunity to tell the judge what he wanted.

possible moment, was "just attached" to Father. As that eased, Father said, Maxwell became a "completely different kid," in that he became "really outgoing," "more open and loving" and seemed to be "definitely thriving."[13] Father even testified that the child shot up in growth in Father's care. All of this indicates that Father created an environment for his son that was physically and emotionally safe and supportive.

It is important to note that Maxwell did not vilify his mother or indicate that he never wanted to see her. To the contrary, he said that he missed her at times while he was at Father's house, enjoyed talking to her on the telephone while there, and wanted to see her every other weekend. The child likewise indicated that he had a good relationship with Mother's husband and enjoyed activities with both of them. If the child's testimony had been totally negative about Mother, this might support Mother's assertion that Maxwell had been manipulated by Father. *See Costley*, 2005 WL 1950114, at *13; 2005 Tenn. App. LEXIS 484, at *39-40 (describing parental alienation syndrome, where one parent seeks to alienate the child from the other parent, and the manipulated child adopts an extreme view of the targeted parent, saying only negative things about that parent). As it is, Maxwell said that he wanted to be able to see Mother regularly, and the GAL said that a parenting plan that designated Father as the primary residential parent but allocated significant parenting time to Mother would be in Maxwell's best interest and give the child "the best of both worlds."

In its decision on the parenting arrangement that would be in Maxwell's best interest, the trial court rightly emphasized the importance of continuity and the fact that Mother had been Maxwell's primary caregiver since the parties' divorce. The trial court found that in the years Maxwell lived with Mother, the child developed well emotionally and physically, made good grades, and participated in extracurricular activities. It expressed reluctance to take "such a drastic measure as a change in custody and a change in school systems." The statutory factors of continuity and the child's primary caregiver have been underscored by our legislature and our courts. "When presented with a request to modify a parenting arrangement, the existing arrangement is generally favored, based on the premise that children tend to thrive in a stable environment." *See Wall*, 2011 WL 2732269, at *21; 2011 Tenn. App. LEXIS 385, at *64 (citations omitted); *see also* Tenn. Code Ann. § 36-6-106(a)(3)(2010) (listing continuity as a factor in custody decisions). "[B]oth the legislature and the courts have recognized the importance of continuity and stability to the welfare of children, including in particular stability in their residential placement and schedules." *Costley*, 2005 WL 1950114, at *17; 2005 Tenn. App. LEXIS 484, at *52 (citations omitted).

We have previously acknowledged that continuity and the parent who has been the child's primary caregiver are often "powerful considerations" in custody disputes. *See Wall*, 2011

---

[13]This was corroborated by the testimony of the child's paternal grandmother.

WL 2732269, at *30; 2011 Tenn. App. LEXIS 385, at *91. However, "[c]ontinuity . . . does not trump all other considerations." *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). "Depending on the facts, a parent who has been a child's primary caregiver may not necessarily be comparatively more fit than the other parent to have permanent custody of the child." *Gaskill*, 936 S.W.2d at 630-31. The purpose of the emphasis on continuity and the primary caregiver is to provide children without an intact family with as much stability and security as possible. In this case, as in *Wall*, "[t]he evidence in the record . . . shows that continuity in this case does not equal stability, because Mother has not provided [Maxwell] a 'stable, satisfactory environment.' . . . . From the evidence in this record, it appears that remaining in Mother's care makes [Maxwell] feel less safe, not more safe." *Wall,* 2011 WL 2732269, at *30; 2011 Tenn. App. LEXIS 385, at *91-92 (quoting Tenn. Code Ann. § 36-6-106(a)(3)). Indeed, it is a testament to the strength of Maxwell's desire to live with Father that the child *wanted* to go to the new school in Father's district, despite missing his friends at his old school, in order to live with Father.

The trial court properly took into account evidence that weighed against changing the designation of primary residential parent, such as evidence that Maxwell had been permitted to watch R-rated movies at Father's home, that Father was in the background talking to Maxwell while he was on the telephone with Mother speaking in a way that she found objectionable, that Father told Maxwell to call his now-wife by a male name to disguise the fact that he had a female overnight guest on a camping trip with the child, and that Maxwell acted out at Mother's house during the transition to living with Father.[14] This evidence, however, pales in comparison to the evidence, credited by the trial court, that on numerous occasions Mother left Maxwell at home alone to go to the local country club to drink, and advised the child to use the firearm hidden under her mattress if the need arose. Even more important, in looking at the forest instead of simply the trees, the record overall shows forcefully that, for good reason, Maxwell felt safer, more secure, and happier at Father's home than he did at Mother's home.

"While we are reluctant to second-guess a trial court's decisions regarding a parenting plan, we will not hesitate to do so if we conclude that the trial court's decision is not supported by the evidence, that the trial court's decision rests on an error of law, or that the child's interests will be best served by another parenting arrangement." *In re Madison K.P.*, No.

---

[14]The trial court also rightly took into account the fact that Father has a child by another relationship with whom he has no relationship. A parent's behavior with another child is relevant to a trial court's evaluation of how the child at issue would be parented. *See Wall,* 2011 WL 2732269, at *28; 2011 Tenn. App. LEXIS 385, at *87. However, regardless of Father's choices with his younger child, it is clear from the record that Father "stepped into the breach" left by Mother in this case, and worked to create a safe supportive environment for Maxwell. *Wall,* 2011 WL 2732269, at *29; 2011 Tenn. App. LEXIS 385, at *89.

M2009-02331-COA-R3-JV, 2010 WL 4810665, at *5; 2010 Tenn. App. LEXIS 736, at *16 (Tenn. Ct. App. Nov. 23, 2010) (citing **Shofner**, 181 S.W.3d at 716). In this case, the trial court's decision "rests on an error of law" in that it erroneously held that Father was required to show that Mother "is unfit to have custody." **Id.** Moreover, from our careful review, the record as a whole shows that "the trial court's decision is not supported by the evidence" and "the child's interests will be best served by another parenting arrangement." **Id.** "[A] decision regarding the child's best interest should be designed to 'promote children's best interests by placing them in an environment that will best serve their physical and emotional needs.'" **Wall**, 2011 WL 2732269, at *26; 2011 Tenn. App. LEXIS 385, at 78; **Gaskill**, 936 S.W.2d at 630. The evidence in this record preponderates against the trial court's factual finding that Maxwell's best interests are served by leaving Mother as his primary residential parent, and preponderates in favor of a finding that Father's home will best serve the child's "physical and emotional needs." **Id.** Therefore, we hold that the trial court erred in denying Father's petition to modify the parenting plan to designate him as the primary residential parent for Maxwell. Accordingly, we reverse the trial court's order and remand the case with directions to enter an appropriate order designating Father as the child's primary residential parent, with reasonable alternate residential parenting time for Mother.

We are mindful that transition will be needed. "[E]vents and lives have not stood still while this custody dispute has been in the courts." **Gorski v. Ragains**, No. 01A01-9710-GS-00597, 1999 WL 511451, at *4 (Tenn. Ct. App. July 21, 1999); **see also Hawkins v. O'Brien**, No. M2008-02289-COAR3-CV, 2009 WL 2058802, at *6 (Tenn. Ct. App. July 15, 2009). Therefore, on remand, the trial court is vested with wide discretion to fashion a parenting arrangement, designating Father as Maxwell's primary residential parent, that provides for appropriate transition and serves the child's overall best interests.[15]

---

[15]On remand, the trial court may, in its discretion, put into place measures to address the parties' demonstrated unwillingness to communicate with each other about their son, such as counseling. As to any guns in the home, we note that the trial court's order in this case ordered that any gun in either parent's home must be "locked or concealed." Respectfully, it is wholly inadequate to order that a firearm in a home with a child be "concealed" from a curious child. Any firearm in a home with a child must be securely locked in a device specifically made to ensure that a child who finds the firearm cannot access it.

**CONCLUSION**

The decision of the trial court is reversed and the cause is remanded for further proceedings consistent with this Opinion. Costs on appeal are assessed against Respondent/Appellee Elizabeth Ann Woodard Maxwell, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE