IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 1, 2021

## JAMIE GRAVATT v. MICHAEL BARCZYKOWSKI

**Appeal from the Circuit Court for Montgomery County**
**No. CC2016-CV-0933      Ross H. Hicks, Judge**

_____

### No. M2019-01481-COA-R3-CV

_____

This appeal arises from the modification of a parenting plan in a post-divorce action, upon a petition filed by the minor child's mother. We have determined that the evidence does not preponderate against the trial court's findings that there was a material change of circumstances under Tennessee Code Annotated sections 36-6-101(a)(2)(B) and 36-6-101(a)(2)(C) and that modification of the parenting schedule and of primary residential parent was in the best interest of the child. Therefore, we affirm the trial court's order.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

Jacob P. Mathis, Clarksville, Tennessee, for the appellant, Michael Barczykowski.[1]

Christopher J. Pittman and Catherine W. Cheney, Clarksville, Tennessee, for the appellee, Jamie Gravatt.

## OPINION

### I.      BACKGROUND

R.B. ("the child") was born in July of 2012 during the marriage of Jamie Gravatt

---

[1] Appellant notified the Office of the Attorney General of his intent to raise a constitutional challenge to the Tennessee Child Support Guidelines on appeal. The State was not a party to the trial court proceedings. On March 15, 2021, the Office of the Attorney General filed notice that the State would not file an appellate brief or otherwise participate in this appeal. *See* Tenn. R. App. P. 32.

("Mother") and Michael Barczykowski ("Father"). Mother and Father were divorced by final decree entered in August of 2016, when the child was four-years-old. The final decree incorporated an agreed permanent parenting plan that named Father the primary residential parent and provided for joint decision-making and equal parenting time between the parties, to follow a week on/week off schedule.

At the time of the divorce, both parties lived in Clarksville, Tennessee. Father was medically discharged from the United States Army. In October of 2016, pursuant to the parental relocation statute,[2] Father notified Mother of his intent to relocate out of state. Mother filed a petition opposing Father's relocation. In response, Father stated that he sought relocation after failing to find suitable employment in Tennessee. Father indicated that he was offered a job with significantly better pay in Maryland, nearby the child's maternal and paternal grandparents and extended family.[3] The child was not yet school-aged, so pending the final hearing on the relocation matter, the parties agreed to meet halfway in Bristol, Virginia to alternate parenting time on a month on/month off schedule. Mother gave birth to another child over the summer of 2017.

By memorandum opinion entered August 15, 2017, the trial court ordered the parties to exercise parenting time on a year on/year off basis and further ordered that each parent was to enjoy "maximum visitation" with the child during the other parent's year on.[4] The trial court found that the child's best interest was served by designating Father as the primary residential parent for the 2017–2018 school year. Father was ordered to pay Mother $208.00 monthly child support, based on the entry of 182.5 days per parent on the child support worksheet. Accordingly, the child enrolled in Kindergarten in Delaware and spent the 2017–2018 school year with Father. During that year, Mother was employed as a part-time substitute teacher and took advantage of her flexible work schedule to visit the child in Delaware on several occasions.

On October 26, 2018, when the child had just begun first grade and was living with Mother in Tennessee, Mother petitioned the court to modify the existing parenting plan. In her petition, Mother alleged material changes in circumstances since entry of the previous parenting plan including: Father's unrealistic expectations of Mother's obligations; Father's demands to speak to the child at any time; Father's daily demands about the child's school; Father's interference with and micromanaging of Mother's parenting; Father's questioning of the child about Mother's care of her; Father's prohibiting the child to visit Mother's family while the child was living in Delaware; Father's inability to communicate

---

[2] Tenn. Code Ann. § 36-6-108.

[3] It appears that the reference to Maryland was made in error because Father's job was in Delaware.

[4] Both Mother and Father were reluctant to agree to a year on/year off parenting schedule. Thereafter, this case was transferred to a different trial court judge.

with Mother; the parties' disagreements concerning times and locations at which to exchange the child; and Father's use of the child as the intermediary between the parties. Mother further alleged that Father's "unrealistic and uncooperative behavior" since entry of the parenting plan "made the year-on/year-off schedule untenable and not in the best interest of the minor child." Mother requested that the trial court enter a new parenting plan naming her primary residential parent and awarding Father "reasonable parenting time during school vacations." Father denied the allegations of the petition.

After mediation failed, the case proceeded to trial on May 6, 2019. By then, Mother had transitioned to working full-time in the local school district while studying, primarily online, to earn a Master's Degree in special education. The child was then nearly seven years old and Mother had remarried. Four months earlier, Father had also remarried, but did not inform Mother of this fact until the day of trial.

Mother, Father, Mother's husband, and the child's paternal grandmother testified at trial. Mother's husband related that he is a member of the United States Army subject to last-minute deployments, but that he was campaigning to avoid relocation to another state. He further testified that the child enjoys a "really good" relationship with her same-aged stepsister and a "great" relationship with her then-20-month-old half-sister. The testimony indicated that Mother and her husband provide a home suitable for children and that he helps care for the child as much as he is able. The child's paternal grandmother related that she lives in Delaware, approximately twenty minutes driving distance from Father, as do most of Father's and Mother's extended family members, several of whom are involved in the child's life. Both parents testified about the positive impact of the child's extracurricular activities. During the child's year in Delaware, Father invited Mother's extended family members to observe the child's karate practices and dance recitals. Mother and Father each provided extensive testimony and exhibits detailing the communication issues and acrimony between them. Mother instructed Father to prohibit his then-fiancée from purchasing school clothing for, posing in photos with, or "being motherly" toward the child. Both parents described their irritation that the child was frequently distracted when calling one parent from the other parent's home.

Two significant themes emerged from the testimony. The first was Father's resentment toward paying child support to Mother. Mother recounted that Father told her that "having to pay child support [was] going to make it very hard for him to be able to co-parent." While the child was living in Delaware with Father during the Kindergarten year, he texted Mother, "I actually tried to maintain a civil relationship between us, and you basically destroyed that with seeking child support that you don't need and don't deserve. I provided [the child] everything she needs financially, yet you try to earn a quick buck off my hard work."

The second theme was that neither parent believed the year on/year off residential parenting schedule in effect was workable or in the child's best interest. In February of the

child's Kindergarten year, Father texted Mother that he did not think it "healthy" for the child to "bounce around" and "try[] to fit in every year." Mother agreed, "I don't think it is either, but it's what is [in] the parenting plan and the only way to change it is going back to court because I know you and I will not agree on where [the child] will go to school every year." At trial, Father opined as follows:

> Q. Mr. Barczykowski, if the Court sees fit to simply dismiss this petition and continue following the schedule, do you think the child's going to be able to thrive under that?
>
> A. I don't, simply because she has such a close bond with not just [my] family in Delaware, but with [Mother's] family in Delaware. She has thrived academically in Delaware. I just see her having a better upbringing if she remained in Delaware for the school year.
>
> Q. So if the Court does see fit to change the [parenting] plan, do you feel like it would be in her best interest to stay there?
>
> A. Absolutely.

Mother recounted that, although the child was performing "pretty well in school," she "struggle[d] in the first grade because she didn't learn everything that the current first graders did down here [in Tennessee]." Mother expressed concern that, in the long run, the child would struggle to change schools yearly because "different schools, different states have different standards of what they teach" and because "as the grades get higher, the material gets harder, and it's going to be harder for her to bounce back."

By memorandum opinion entered July 15, 2019, the trial court found "the parties agree and the court finds that the year on/off schedule is not working." The court also found and noted the parties' agreement that the residential parenting schedule in place was not in the child's best interest. Additionally, the trial court noted Mother's "unrefuted testimony" that Father's original designation as primary residential parent "was done by agreement because [he] misinformed the Mother that [he] was required to be designated as Primary Residential Parent in order to keep the child's Tricare coverage."[5] After considering the best interest factors set forth in Tennessee Code Annotated section 36-6-106, the trial court determined that it was in the child's best interest for Mother to be designated primary residential parent and for Mother's proposed parenting plan to be adopted.

On July 31, 2019, Father moved to impute income to Mother, alleging that she was

---

[5] Mother was not represented by counsel during the divorce proceedings.

voluntarily underemployed. The trial court denied the motion, reasoning that the proof at trial supported Mother's income as previously found by the court, and that Mother's work within the school system would allow her to complete her graduate degree and earn a teaching job that would "increase her income in the long run." The modified parenting plan was entered as the court's order on August 13, 2019. Pursuant to the plan, Father was awarded 100 days of parenting time to include every fall break, spring break, half of winter break, and every summer break. Mother was awarded 265 days of yearly parenting time. Pursuant to the child support worksheet, Father's child support obligation was modified to $955.00 monthly by agreed order entered August 29, 2019. Father appealed.

## II. ISSUES

Father raises three issues on appeal, which we quote verbatim from his brief:

1. Did the trial court err in finding a material change of circumstance necessitating modification of the parenting plan?

2. Should a cost of living adjustment be factored into child support obligations?

3. Should a post-marital child be included in child support calculations?

In the posture of Appellee, Mother raises the issue of whether the appeal lacks justiciable issues such that she is entitled to relief under the frivolous appeal statute.

## III. STANDARD OF REVIEW

"A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions." *Armbrister v. Armbrister*, 414 S.W.3d 684, 692 (Tenn. 2013) (citing *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007)). Therefore, "appellate courts must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings." *Id.*; *see also* Tenn. R. App. P. 13(d). Likewise, trial courts have "broad discretion in formulating parenting plans" because they "are in a better position to observe the witnesses and assess their credibility." *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 495 (Tenn. 2017) (citing *Armbrister*, 414 S.W.3d at 693). On appeal, we review a trial court's decision regarding parenting schedules for an abuse of discretion. *Armbrister*, 414 S.W.3d at 693 (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001)). "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an

injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standard to the evidence found in the record." *Eldridge*, 42 S.W.3d at 88.

We review a trial court's child support determination under the abuse of discretion standard. *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005).

We review questions of law de novo, affording the trial court's decision no presumption of correctness. *Armbrister*, 414 S.W.3d at 692 (citing *Mills v. Fulmarque*, 360 S.W.3d 362, 366 (Tenn. 2012)).

## IV. DISCUSSION

### 1.

To modify an existing parenting plan, the trial court must first determine whether a material change in circumstances has occurred. *Armbrister*, 414 S.W.3d at 697–98 (citing Tenn. Code Ann. § 36-6-101(a)(2)(C)). "The petitioner . . . must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interests, and the change must have occurred after entry of the order sought to be modified." *Gentile v. Gentile*, No. M2014-01356-COA-R3-CV, 2015 WL 8482047, at *5 (Tenn. Ct. App. Dec. 9, 2015) (citing *Caldwell v. Hill*, 250 S.W.3d 865, 870 (Tenn. Ct. App. 2007)). "[A] material change of circumstance for purposes of modification of a residential parenting schedule may include, but is not limited to, significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child." Tenn. Code Ann. § 36-6-101(a)(2)(C). If a material change in circumstances is found, the court must then determine whether a modification of the parenting plan is in the child's best interest in consideration of the factors set forth in Tennessee Code Annotated section 36-6-106(a). *Armbrister*, 414 S.W.3d at 697–98. "Facts or changed conditions which reasonably could have been anticipated when the initial residential parenting schedule was adopted may support a finding of a material change in circumstances, so long as the party seeking modification has proven by a preponderance of the evidence 'a material change of circumstance affecting the child's best interest.'" *Id*. at 704 (quoting Tenn. Code Ann. § 36-6-101(a)(2)(C)).

Where the issue before the court is a modification of the residential parenting schedule, the threshold for determining whether there has been a material change of circumstances is "much lower" as compared to the threshold for modification of the

primary residential parent. *Burnett v. Burnett*, No. M2014-00833-COA-R3-CV, 2015 WL 5157489, at *6 (Tenn. Ct. App. Aug. 31, 2015). Where the issue before the court is modification of the primary residential parent ("custody"), then:

> the petitioner must prove by a preponderance of the evidence a material change in circumstance. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

Tenn. Code Ann. § 36-6-101(a)(2)(B). *See Armbrister*, 414 S.W.3d at 703 (comparing the standard for an action to modify custody to the standard for an action to modify only a residential parenting schedule).

To modify a residential parenting schedule, "merely showing that the existing arrangement [is] unworkable for the parties is sufficient." *Rose v. Lashlee*, No. M2005-00361-COA-R3-CV, 2006 WL 2390980 at *2 n.3 (Tenn. Ct. App. Aug. 18, 2006). As found by the trial court, both Mother and Father agreed that the year on/year off schedule was entered into reluctantly, was not working well, would become unworkable as the child progressed in school, and did not serve the child's best interest. The parties' testimony and exhibits amply support the trial court's finding and modification of the previous year on/year off residential parenting schedule. Accordingly, we affirm.

We turn now to material change in circumstance sufficient to consider whether a modification of custody was in the child's best interest. Father argues that "it was error for the trial court to find [] a material change in circumstances" because "nothing between the parties had changed, other than the parties exercising the parenting plan established by the court." We respectfully disagree. Again, in the context of a modification of custody, a material change in circumstance "may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child." Tenn. Code Ann. § 36-6-101(a)(2)(B). Furthermore, "trial courts have broad discretion in determining which parent should be the primary residential parent and appellate courts are reluctant to second guess a trial court's decision on this issue when so much depends on the trial court's assessment of the witnesses' credibility." *In re Shayla H.*, No. M2013-00567-COA-R3-JV, 2014 WL 2601564 at *5 (Tenn. Ct. App. June 9, 2014) (citations omitted).

Here, for instance, the year on/year off parenting plan provided specific instructions about transportation arrangements and costs related to the exchange of the child. In her petition, Mother alleged constant argument between the parties regarding this provision of the plan. At trial, there was evidence that Father unilaterally booked a flight for the child to return to Delaware before Mother's parenting time was complete, despite the parenting

plan provision that the parties were to meet halfway unless they jointly made other arrangements. Under the parenting plan, payment of long-distance travel costs was to be shared equally. Yet, more than once, Father asked Mother to waive child support to help offset his transportation expense. These failures to adhere to the parenting plan established the threshold material change in circumstance for modification of primary residential parent. Based on the foregoing, as well as our review of the entire record, we conclude that the evidence does not preponderate against the finding of a material change in circumstance sufficient to modify the primary residential parent.

*Best Interest*

Once the trial court determines that there has been a material change in circumstance sufficient to modify the residential parenting schedule or primary residential parent, the second step in the modification analysis requires the court to determine whether modification is in the child's best interest under the factors in Tennessee Code Annotated section 36-6-106(a). *Boyer v. Heimermann*, 238 S.W.3d 249, 259–60 (Tenn. Ct. App. 2007). The best interest determination "is a fact-sensitive inquiry." *Steakin v. Steakin*, No. M2017-00115-COA-R3-CV, 2018 WL 334445 at *5 (Tenn. Ct. App. Jan. 9, 2018). The determination "'does not call for a rote examination of each of [the relevant] factors and then a determination of whether the sum of the factors tips in favor of or against the parent.'" *Id*. (quoting *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005)). Rather, "'[t]he relevancy and weight to be given each factor depends on the unique facts of each case.'" *Id*. The trial court is directed to consider the following factors when conducting the best interest analysis:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be considered by the court as a lack of good faith effort in these proceedings;

- 8 -

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). . . .;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(15) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-106(a).

The trial court found factor one to be equal because both parents "have essentially exercised equal parenting time since their divorce." The court placed considerable weight on factor two, finding that "Mother is more likely to foster a good relationship with Father than the Father is with the Mother." The trial court acknowledged Father's difficulties in communicating with the child due to distractions and disruptions while she is in Mother's home, but found that "this can be easily remedied." Father's "disparaging and distressing comments to Mother," including referring to her as "ya leech," and to himself as "just a pay day" were viewed unfavorably by the trial court. So, too, were Father's objections to paying child support and his admonition that paying child support would "be the biggest strain on" the co-parenting relationship, despite earning nearly ten times as much income as Mother. Finally, as to factor two, the trial court considered Father's emailed complaint that Mother's visiting the child 19 out of 127 days was "excessive" during his year of custody. The court found this to be "evidence that Father would be less likely to support a positive relationship with the child's Mother should the Father be designated as the Primary Residential Parent."

As to the fourth factor, the trial court found:

[W]hile both parties are certainly capable of providing the child with food, clothing, medical care, education, and other necessary care, the Mother has a greater disposition to provide these necessities than does Father. The Court again refers to Father's resentment toward paying child support [and] his statement that he was financially devastated by paying only $200.00 a month in child support when [h]is income is over $100,000.00 per year. This factor favors Mother.

As to factor nine, the trial court considered the undisputed proof of the child's engagement in extracurricular activities in Tennessee and Delaware. The court found that this factor favored Father because although "the child has bonded with her baby sister over the last year and has a strong relationship with her step-sister . . . most of the child's extended family relationships are in Delaware." As to the tenth factor, in consideration of the child's "issues with changing schools," the trial court reasoned that the child was "now settled" and enjoying a "stable environment in Tennessee," and that it "concern[ed] the Court to require the child to change schools for what would be the third time in three years." The court found that the fourteenth factor favored Mother because "Mother works for the school system and is therefore off work when the child is not in school," whereas "Father's work schedule is longer and does not follow the Delaware school schedule."

Other relevant factors that impacted the child's best interest weighed in Mother's favor. Importantly, the trial court noted that Father did not seek to be designated primary

- 10 -

residential parent in his answer to the petition to modify the parenting plan. The court found that Mother was afforded no notice of any allegations against her or of Father's request to be designated primary residential parent until five days before trial. The trial court also considered certain exhibits showing that "Father has engaged in a pattern of failing to work with the Mother in transportation."

Upon consideration of all of the above factors, the trial court determined that Mother's designation as primary residential parent and the modification of the residential parenting schedule, as proposed by Mother, would be in the child's best interest. Father does not challenge the trial court's best interest findings, and we conclude that the evidence does not preponderate against them. Accordingly, we affirm the trial court's finding that modification of the residential parenting schedule and of primary residential parent was in the best interest of the child.

2.

Father "believes that a locality adjustment can and should be made for parents, like himself, who live outside the state of Tennessee." Father contends that, as applicable to the calculation of child support generally, "Tennessee should adopt a deviation allowing for a locality adjustment based on where the parties reside at the time of modification." After a thorough review of the record, we find that Father failed to properly raise this issue in the trial court. Father testified briefly about the "prerequisite context" behind his general "frustration" toward Mother regarding child support payments:

A. I had two mortgages.[6] My ex-wife stuck me with a house in Clarksville that I had to take care [of], so I had a mortgage there. I was trying to become established in Delaware and purchase a new house. On top of that, the cost of living in Delaware is almost triple than it is in Tennessee. So when [Mother's counsel] expresses that I make all this money, I really don't.

Q. There's a difference between gross and netting?

A. Absolutely. And I learned that quickly when you're in a higher tax bracket.

Q. You understand the rules, though, don't take into account cost of living?

A. And I've never been late for a child support payment.

Father stated "it's not a matter of me paying the child support," and affirmed that he

---

[6] Father admitted that he paid two mortgages for two months following the divorce.

- 11 -

understood the obligation to pay the amount of child support ordered by the court, despite his opinion that Mother did not deserve such payments.

The record is clear that the issue Father now raises on appeal was not raised through a pleading or argued at trial. "The law in Tennessee is well settled that issues not raised in the trial court may not be raised on appeal." *Blankenship v. Anesthesiology Consultants Exch., P.C.*, 446 S.W.3d 757, 760 (Tenn. Ct. App. 2014); *see also Jackson v. Burrell*, 602 S.W.3d 340, 344 (Tenn. 2020). Therefore, this issue has been waived.

3.

Father argues "a parent should not be responsible for a child the other parent conceives after the dissolution of the marriage" and that considering "the post-marital child(ren) into child support modifications" is inequitable. The current agreed child support order entered August 29, 2019 and the incorporated child support worksheet show that Mother does not receive a credit for an in-home child. The child's younger sister born to Mother and her husband is not considered in Father's child support calculation. Therefore, we hold that this issue is moot.

4.

Mother requests her costs and reasonable attorney fees on appeal pursuant to Tennessee Code Annotated section 27-1-122, which provides as follows:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

The decision whether to award damages for a frivolous appeal rests solely in our discretion. *Chiozza v. Chiozza*, 315 S.W.3d 482, 493 (Tenn. Ct. App. 2009). Appellate courts exercise their discretion to award fees under this statute "'sparingly so as not to discourage legitimate appeals.'" *Eberbach v. Eberbach*, 535 S.W.3d 467, 475 (Tenn. 2017) (quoting *Whalum v. Marshall*, 224 S.W.3d 169, 181 (Tenn. Ct. App. 2006)). "'Successful litigants should not have to bear the expense and vexation of groundless appeals.'" *Whalum*, 224 S.W.3d at 181 (quoting *Davis v. Gulf Ins. Grp.*, 546 S.W.2d 583, 586 (Tenn. 1977)). "A frivolous appeal is one that is 'devoid of merit,' or one in which there is little prospect that it can ever succeed." *Indus. Dev. Bd. v. Hancock*, 901 S.W.2d 382, 385 (Tenn. Ct. App. 1995). Exercising our discretion, we deny the request for attorney fees and costs pursuant to the statute.

## V.      CONCLUSION

We affirm the decision of the trial court.  The case is remanded for such further proceedings as may be necessary and consistent with this Opinion.  Costs of the appeal are taxed to the appellant, Michael Barczykowski.

_____
JOHN W. McCLARTY, JUDGE